**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOB CREATORS NETWORK,<br><br>     Plaintiff,<br><br>       v.<br><br>OFFICE OF THE COMMISSIONER OF BASEBALL D/B/A MAJOR LEAGUE BASEBALL, *et al.*,<br><br>     Defendants. | Civil Action No. 1:21-cv-4818-VEC |

**<u>REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION</u>**

Howard Kleinhendler
HOWARD KLEINHENDLER ESQUIRE
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................... 1

Standard of Review .................................................................................................... 2

Argument ................................................................................................................... 3

I.  Plaintiff has standing ........................................................................................ 3

    A.  Plaintiff raises civil-rights injuries. ......................................................... 4
    B.  Plaintiff raises economic injuries. ............................................................ 5
    C.  Plaintiff raises continuing Article III injury. ........................................... 6
    D.  The MLBPA Defendants are necessary parties. ....................................... 6

II.  Plaintiff is likely to prevail on the merits ........................................................ 9

    A.  Plaintiff is likely to prevail on its civil rights claims. .............................. 9

        1.  Defendant MLB acts under color of legal authority. .................... 9
        2.  Discrimination based on Georgia residence is class-based
               discrimination, and defendants showed class-based animus. ................... 11
        3.  Defendants' boycott of Georgia qualifies as "regulation." ...................... 12
        4.  Plaintiff is likely to prevail on its claims under the KKK Act ................. 13

            a)  Plaintiffs properly allege conspiracy. ............................... 13
            b)  Defendant Manfred exceeded his authority. ..................................... 14

        5.  Plaintiff is likely to prevail on its claims under § 1983. ........................... 16

    B.  Plaintiff is likely to prevail on tortious interference with a contract,
        business relationship, and promissory estoppel. ....................................... 16

III.  The remaining *Citigroup-Winter* factors favor Plaintiffs. ................................. 18

    A.  Plaintiffs are likely to suffer irreparable harm without preliminary relief ............ 18
    B.  Defendants lack a countervailing equitable harm under the unclean-hands
        doctrine. ................................................................................................... 18
    C.  The public interest favors Plaintiff. ......................................................... 19

Conclusion ................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*AARP v. U.S. EEOC*, 226 F.Supp.3d 7 (D.D.C. 2016) ....................................................3

*Asa v. Pictometry Intern. Corp.*, 757 F.Supp.2d 238 (W.D.N.Y. 2010)...........................2

*Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*, 159 F. Supp. 3d 324 (E.D.N.Y. 2016).........................................................................................................17

*Blessing v. Freestone,* 520 U.S. 337 (1997) ...................................................................16

*Bose v. Interclick*, 2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011)....................................17

*Brady v. Livingood*, 360 F. Supp. 94 (D.D.C. 2004) ........................................................9

*Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) ......................................10

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 846 F.3d 35 (2d Cir. 2017) .......18

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017)........................................................................................................6

*Chen-Oster v. Goldman*, 251 F. Supp. 3d 579 (S.D.N.Y. 2017) ......................................6

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016)................................................12

*City of New York v. Minetta*, 262 F.3d 169 (2d Cir. 2001)............................................11

*City of Waukesha v. EPA,* 320 F.3d 228 (D.C. Cir. 2003)................................................4

*Coggins v. County of Nassau*, 988 F.Supp.2d 231 (E.D.N.Y. 2013)................................8

*Cooper v. City of New York*, 2019 WL 3642996 (E.D.N.Y. Aug. 5, 2019) ..................14

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)........................................12

*Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567 (2d Cir. 2018)............................4

*Ex parte Young*, 209 U.S. 123 (1908) ............................................................................16

*Floyd v. City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011) ................................11

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ..........................................................4

*Granfinanciera v. Nordberg*, 492 U.S. 33 (1989)............................................................5

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)..................................................................13

*Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984)..............................................................13

*Holt v. Cont'l Grp., Inc.*, 708 F.2d 87 (2d Cir. 1983).......................................................2

*Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351 (2d Cir. 1980) ..................................11

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) ........................................9, 10

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ........................................................................4

*L. Fatato, Inc. v. Miller Brewing Company*, 582 F. Supp. 1377 (E.D.N.Y. 1984)........17

*Ludtke v. Kuhn*, 461 F. Supp. 86 (1978) .....................................................................9, 10

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................................6

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019)..............................9, 10

*Mastrio v. Sebelius*, 768 F.3d 116 (2d Cir. 2014).................................................................2

*Meyer v. Kalanick*, 2016 WL 3509496 (S.D.N.Y. June 20, 2016) ......................................8

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,* 883 F.3d 32 (2d Cir. 2018) ....................2

*PenneCom B.V. v. Merrill Lynch & Co.*, Inc., 372 F.3d 488 (2d Cir. 2004) ......................18

*Perez v. Ledesma*, 401 U.S. 82 (1971)................................................................................16

*Pers. Adm'r v. Feeney,* 442 U.S. 256 (1979)......................................................................12

*Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384 (S.D.N.Y. 2008).......................9

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984).......................................................5

*Smith v. Burge*, 222 F.Supp.3d 669 (N.D. Ill. 2016) .........................................................13

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) .....................................5

*United States v. Students Challenging Regulatory Agency Procedures*,
    412 U.S. 66914 (1973)......................................................................................5

*Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002).......................16

*Vinifera Imps. Ltd. v. Societa Agricola Castello Romitorio SRL*, 2020 U.S. Dist.
    LEXIS 43374 (E.D.N.Y. 2020) .......................................................................17

*Warth v. Seldin*, 422 U.S. 490 (1975) .................................................................................4

*Williamson v. Maciol*, 839 F.App'x 633 (2d Cir. 2021) .....................................................2

*Yang v. Kellner*, 458 F.Supp.3d 199 (2d Cir. 2020) ..........................................................2

## STATUTES

42 U.S.C. § 1983.............................................................................................................*passim*

42 U.S.C. § 1985.............................................................................................................*passim*

Civil Rights Act of 1871, 17 Stat. 13 ...................................................................................16

Judiciary Act of 1875, 18 Stat. 470.......................................................................................16

COLO. REV. STAT. § 32-14-104 ............................................................................................10

COLO. REV. STAT. § 32-14-106(2) ........................................................................................10

Election Integrity Act,
    2021 Ga. Laws 9 ............................................................................................................17

## RULES AND REGULATIONS

FED. R. CIV. P. 8(a) ..............................................................................................................9

## <u>OTHER AUTHORITIES</u>

Charles Gasparino & Morgan Phillips, MLB Commissioner Decided to Move All-Star
Game after Pressure from Stacy Abrams on Voting Issues: Sources, FOX NEWS,
Apr. 7, 2021 .................................................................................................................8

Alexander K. Gold, Austin J. Drukker, and Ted Gayer, *Why the federal government
should stop spending billions on private sports stadiums* (Brookings Inst.
Sept. 8, 2016) ............................................................................................................10

Robert D. Manfred, Press Release, MLB Statement regarding 2021 All-Star Game
(Apr. 2, 2021)..............................................................................................................7

National Sports Law Institute of Marquette University Law School, Sports Facility Reports
on Major League Baseball, Appendix 1, to Sports Facility Reports, Volume 21,
Research completed as of July 15, 2020.....................................................................10

Will Peterson, *Gov. Polis will be 'burning up the phones' to bring MLB All-Star Game to
Colorado,* 9News, April 4, 2021 ...............................................................................19

Michael Silverman, *Union President Says MLB Players Ready to Discuss Moving All-
Star Game from Georgia in Wake of Voter-Restriction Laws,* BOSTON GLOBE,
Mar. 26, 2021 ..............................................................................................................7

## <u>TABLE OF EXHIBITS</u>

Michael Silverman, *Union President Says MLB Players Ready to Discuss Moving All-Star Game from Georgia in Wake of Voter-Restriction Laws*, BOSTON GLOBE, Mar. 26, 2021 ................................................................................................................... A

Robert D. Manfred, Press Release, MLB Statement regarding 2021 All-Star Game (Apr. 2, 2021) ........................................................................................................... B

Charles Gasparino & Morgan Phillips, MLB Commissioner Decided to Move All-Star Game after Pressure from Stacy Abrams on Voting Issues: Sources, FOX NEWS, Apr. 7, 2021 ..................................................................................................................... C

National Sports Law Institute of Marquette University Law School, Sports Facility Reports on Major League Baseball, Appendix 1, to Sports Facility Reports, Volume 21, Research completed as of July 15, 2020 ................................................................... D

Alexander K. Gold, Austin J. Drukker, and Ted Gayer, *Why the federal government should stop spending billions on private sports stadiums* (Brookings Inst. Sept. 8, 2016) ........................................................................................................... E

Will Peterson, *Gov. Polis will be 'burning up the phones' to bring MLB All-Star Game to Colorado,* 9News, April 4, 2021........................................................................ F

## INTRODUCTION

By moving the All-Star game to Denver three months before game day, MLB caved to mob rule to selfishly promote itself as an active member of the woke cancel culture.  Instead of addressing its perceived problem with Georgia's new voting law through judicial action or lobbying, as its Constitution provides, it decided to impose rough justice and crush thousands of Atlanta small businesses. MLB and its union recognize the harm caused by this callous action and their brazen message to Atlanta's thousands of black-owned businesses is: "too bad, we can do as we please." [1]  But this Court has the power to stand up to a spoiled, ingratiate bully, that receives billions in government funding, enjoys unprecedented antitrust immunity and purports to be America's National Pastime. This Court can demonstrate that there are federal Constitutional rights afforded to all Americans, including small business owners in Atlanta.

Denver has no room to complain about the game going back to Atlanta.  Instead of standing side by side with his brothers and sisters in Georgia victimized by the MLB, Colorado's governor actively sought out the game by advancing his state as having more liberal and enlightened voting laws.  Shame on him!  Colorado's unclean hands prevent any of their potential losses from being considered.

As set forth below, Defendants' arguments are easily disposed.  Plaintiff has standing.  Its Constitutional claims are sound.  The conspiracy is properly plead. The elements of irreparable injury, likelihood of success on the merits and balance of hardships are met.  Georgia is ready and

---

[1] See Letter dated June 8, 2021 from Bishop Aubrey Shines, Chairman and Founding Member of Conservative Clergy of Color (Reply Declaration of Howard Kleinhendler, Ex. 1).

able to take the Game back.[2]  Plaintiff's motion should be granted.

## STANDARD OF REVIEW

The Second Circuit's "precedents draw a distinction between mandatory injunctions, which alter the status quo, and prohibitory injunctions," like that sought by Plaintiff, "which maintain it."  *Williamson v. Maciol*, 839 F.App'x 633 (2d Cir. 2021).  For the purposes of determining whether an injunction is mandatory or prohibitory, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy," *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,* 883 F.3d 32, 36–37 (2d Cir. 2018) ("*NASL*") (citation omitted), which is "really [the] status quo ante." *Id.*, 883 F.3d at 37 n.5.  The Second Circuit, along with several others, has defined the status quo ante for prohibitory injunctions as "the situation that existed between the parties immediately prior to the events that precipitated the dispute," *Asa v. Pictometry Intern. Corp.*, 757 F.Supp.2d 238, 243 (W.D.N.Y. 2010), rather "the situation existing at the moment the lawsuit is filed."  *Yang v. Kellner*, 458 F.Supp.3d 199, 218 (2d Cir. 2020) (quotation marks and alteration omitted). As the Second Circuit explained in *NASL*:

> This special "ante" formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current 'status quo' precipitated by their wrongdoing.

*NASL*, 883 F.3d at 37 n.5.  Finally, it is well established that, in issuing a prohibitory injunction to preserve the status quo, the court "is not confined to ordering the parties to do nothing," and instead "may require parties to take action."  *Mastrio v. Sebelius*, 768 F.3d 116, 120-21 (2d Cir. 2014); *see also Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 89-90 (2d Cir. 1983) (characterizing plaintiff's

---

[2] See Letter dated June 8, 2021 from Georgia State Senator Butch Miller, President Pro Tempore, "If the Court chooses to bring the 2021 All Star Game back to Atlanta, we welcome it with open arms."  (Kleinhendler Reply Dec., Ex. 2). Letter dated June 8, 2021, from Georgia Congressman Barry Loudermilk whose district includes Truist Park. (*Id.* Ex. 3)

request for reinstatement of her employment as "a restoration of the *status quo ante*").

The events leading to this dispute are Defendants' acts furthering an unlawful conspiracy that culminated in MLB's taking the All-Star Game from Atlanta on April 2, 2021 and moving it to Denver on April 6, 2021. Plaintiff seeks injunctive relief to restore the status quo ante that existed prior to that date, namely, to restore the 2021 All-Star Game to Atlanta. Accordingly, Plaintiff seeks a prohibitory injunction to restore the status quo ante existing prior to the events that precipitated the dispute.  Under this standard Plaintiff must show, among other things, "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party," *NASL*, 883 F.3d at 37 (citation omitted), rather than meeting the "heightened legal standard" for mandatory injunctions, namely, "a clear of substantial likelihood of success on the merits."  *Id.* (citation omitted).  Plaintiff nevertheless satisfies either standard for the reasons stated below.

## ARGUMENT

## I.   PLAINTIFF HAS STANDING.

Although MLB and MLBPA question JCN's standing for injunctive relief and damages, only injunctive relief is relevant in this motion.  JCN and its members suffer numerous ongoing and cognizable injuries, caused by Defendants' moving the All-Star Game and redressable by this Court. That is all that Article III requires for constitutional injury. As a membership organization, Reply Ortiz Decl. ¶¶ 2-4, JCN need not resort to the test for "indicia of membership" applicable to organizations lacking actual members. *AARP v. U.S. EEOC*, 226 F.Supp.3d 7, 16 (D.D.C. 2016). In any event, JCN meets that test. *Compare id. with* Reply Ortiz Decl. ¶ 4 (membership voice in

JCN policy, membership funding). Thus JCN has associational standing.[3]

Significantly, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal," *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and Defendants' arguments confuse standing with the merits. This Court must evaluate JCN's standing by assuming that JCN's merits views are correct. *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003) ("one must assume the validity of a plaintiff's substantive claim at the standing inquiry"). Thus, plaintiffs "have standing to pursue their quasi-contract claims irrespective of the fact that defendants propose a reading of a statute that would, if accepted, undermine the merits of plaintiffs' claims." *Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 575 (2d Cir. 2018). Otherwise, all losing plaintiffs would lose for lack of standing.

A.     **Plaintiff raises civil-rights injuries.**

JCN and its members raise important constitutional rights under the Equal Protection, Privileges and Immunities, and Commerce Clauses to be free from state-based discrimination in our federal system. *See* Pl.'s Memo at pp. 5-15. Defendants largely ignore these foundational rights by challenging instead the scope of injuries that Defendants put forward. That is not the law:

> [C]ognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates, and customers of that class may also be injured[.]

*Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997). Thus, while Defendants targeted Georgia, the Georgia residents affected by Defendants' unconstitutional state-based boycott suffer their own cognizable injuries. There is no requirement that a person or class of people injured by illegal

---

[3] Associational standing is type of third-party standing, which applies generally to plaintiffs with constitutional standing and, prudentially, a close relationship with members hindered in suing themselves. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). JCN members lack the economic ability or individual cost-benefit justification to bring their own suit and fear reprisals. *See* Supporting Declaration of Patricia Tolson-Rummel, dated June 8, 2021.

action be expressly named in or targeted by the challenged action.

Moreover, the right to be free from state-based discrimination is not the only cognizable constitutional injury that JCN's members suffer. Defendants have also violated the associational rights of JCN's members: "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Defendants deny—intentionally—Georgia residents these important associational benefits with travelers to the All-Star Game. That too is cognizable Article III injury.

### B.   Plaintiff raises economic injuries.

JCN's contract and tort-based rights are "paradigmatic private rights ... [that] lie at the protected core of Article III judicial power." *Granfinanciera v. Nordberg*, 492 U.S. 33, 56 (1989) (quotations marks omitted). They are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 587 (1985) (quotation marks omitted). There is, therefore, no question of JCN's standing here.

While JCN members face significant losses that the requested injunction would avoid, the size of the losses is not an Article III barrier: "We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than ... a $ 5 fine and costs and a $1.50 poll tax." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973). JCN's members face sufficient financial loss for this Court to have Article III jurisdiction. *See* Supporting Declaration of Ronald Christopher Florence, dated June 8, 2021. In addition, JCN has standing in its own right, based on its ongoing and continuing damages of diversion of resources to counteract Defendants' unlawful actions. *See* Ortiz Reply Decl. ¶ 5. Under the settled precedent of this Circuit, "where an organization diverts its resources away from

its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). Defendants' claims to the contrary seek to impermissibly convert Article III into a merits defense.

### C.       Plaintiff raises continuing Article III injury.

Defendants argue that the *past* injuries of JCN and its members cannot support Article III stranding for *prospective* injunctive relief, which is wrong for two independently fatal reasons. First—and JCN should not have to tell MLB this in New York—"it ain't over 'til it's over." As long as the All-Star Game remains to be played, and it is still five weeks away, it still could be played in Atlanta. *Cf. Chen-Oster v. Goldman*, 251 F. Supp. 3d 579, 590 (S.D.N.Y. 2017) ("Whether an injunctive relief claim can continue is a question of mootness, not standing.") (quotation marks and alterations omitted). Second, the injuries of JCN and its members are *continuing* injury, based on the ongoing harms from MLB's actions. In particular, absent injunctive relief from this Court, JCN will continue to divert significant resources to remedy Atlanta-area injuries to its members. Ortiz Reply Dec. ¶ 5. This type of diverted-resource injury is cognizable injury under Article III, Section I.B, *supra*, and it continues into the future. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("present case or controversy regarding injunctive relief [fails] if unaccompanied by any continuing, present adverse effects"). JCN's injuries are not *past*, much less *wholly past*.

### D.       The MLBPA Defendants are necessary parties.

MLBPA suggests that relief against it cannot redress Plaintiff's injuries because MLBPA did not move the All-Star Game to Denver, and MLBPA cannot move it back to Atlanta. While MLBPA may not have a formal role under the Major League Constitution in deciding to move the

All-Star Game (a matter on which that document is silent), contemporaneous statements by both Defendants Manfred and Clark indicate that Clark and the MLBPA (as well as its current player members) were directly involved in, supported, and approved of the decision to move the game – which is the direct cause of the Plaintiff's constitutional and common law injuries. As such, the MLBPA defendants are co-conspirators and necessary parties to this proceeding.

On March 26, 2021, Clark publicly stated that the "players are very much aware" of the Georgia law and that:

> As it relates to the All-Star Game, we have not had a conversation with the league on that issue. If there is an opportunity to, we would look forward to having that conversation.[4]

The April 2, 2021, MLB press release confirms that Defendants Clark and the MLBPA did have those discussions and were intimately involved in the decision-making process.

> Over the last week, we have engaged in thoughtful conversations with Clubs, former and current players, the Players Association, and The Players Alliance, among others, to listen to their views. I have decided that the best way to demonstrate our values as a sport is by relocating this year's All-Star Game and MLB Draft.[5]

There is no indication in contemporaneous statements by Clark or MLBPA of any opposition to moving the game from Atlanta, giving rise to a reasonable inference that Clark and the MLBPA supported and approved of that decision.

Moreover, contemporaneous press reports indicate that MLBPA's members, working with Democrat-aligned interest groups, pressured MLB to move the game with threats that "the All-Star Game would be turned into a political event and players would boycott the game," leading

---

[4] Michael Silverman, *Union President Says MLB Players Ready to Discuss Moving All-Star Game from Georgia in Wake of Voter-Restriction Laws*, BOSTON GLOBE, Mar. 26, 2021 (Exh. A).

[5] Robert D. Manfred, Press Release, MLB Statement regarding 2021 All-Star Game (Apr. 2, 2021) (Exh. B).

Manfred to "decide[] that the easiest way to deal with the matter was to leave Georgia." [6]  Such a player boycott would have violated the currently effective collective bargaining agreement, which mandates full participation for any player elected or selected for the All-Star team.  *See* 2017-2021 Basic Agreement, Art. XV, § N(3)(e)(i) and (ii) (ECF No. 30 Exh. 1).

It does not matter that the MLBPA lacks the power to return the game to Atlanta; this Court has the power. What matters is that the MLBPA, its Executive Director Tony Clark and its members successfully pressured and conspired with MLB to move the game, giving rise to the resulting civil rights and tort violations outlined in the Complaint.

Furthermore, as a co-conspirator and driving force behind the original decision to move the game, Clark and the MLBPA are necessary parties to this proceeding.  While "[i]n a suit to enjoin a conspiracy not all the conspirators are necessary parties," it does not, as MLBPA appears to contend, "follow that a co-conspirator <u>cannot</u> be a necessary party."  *Meyer v. Kalanick*, 2016 WL 3509496, at *3 (S.D.N.Y. June 20, 2016). Plaintiff has alleged a conspiracy between, at a minimum, MLB and MLBPA,[7] as well as other individuals and businesses whose identity is currently unknown. In particular, press reports indicate that certain of MLBPA's members, potentially in concert with MLBPA or Clark, engaged in a separate course of unlawful overt acts in furtherance of the conspiracy by threating to boycott the game.  A conspiracy requires, among other things, a common plan between two or more persons; accordingly, MLBPA, as MLB's co-conspirator, is a necessary party for the civil rights conspiracy claims under 42 U.S.C. Sections

---

[6] Charles Gasparino & Morgan Phillips, MLB Commissioner Decided to Move All-Star Game after Pressure from Stacy Abrams on Voting Issues: Sources, FOX NEWS, Apr. 7, 2021 (Exh. C).
[7] Plaintiff does not allege any "intra-corporate" conspiracy between MLB and Commissioner Manfred, on the one hand, or on the other hand, between Executive Director Clark and MLBPA.  However, as discussed below, MLB Commissioner Manfred's *ultra vires* actions in moving the game from Atlanta would qualify for the exception to the intra-corporate conspiracy requirement for cases where defendants are alleged to have acted outside the scope of their employment.  *See Coggins v. County of Nassau*, 988 F.Supp.2d 231, 248-49 (E.D.N.Y. 2013) (citations omitted).

1983 and 1985(3) and the civil conspiracy claim under New York law.  *See* Compl. Counts 1, 2 and 6 (ECF No. 1).

## II.       PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS.

### A.       Plaintiff is likely to prevail on its civil rights claims.

As set forth in this Section, JCN is likely to prevail on its civil-rights claims. Significantly, there is no heightened pleading standard in civil rights claims. *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 394 (S.D.N.Y. 2008) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)) (claims under § 1983); *accord Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (claims under § 1985(3)). JCN meets the test set out in FED. R. CIV. P. 8(a), which is all that these authorities require.

#### 1.       Defendant MLB acts under color of legal authority.

MLB's unique status and symbiotic relationship with all levels of government is valuable, but it comes at a regulatory cost to MLB—state-actor culpability—which is a societal benefit for parties like JCN and its members whom MLB injures. Although Defendants dispute that MLB acts under color of law, there are three alternate tests for finding a private actor liable as acting under color of state law: (1) the Public Function Test; (2) the Compulsion Test; and (3) the Close Nexus or Joint Action Test. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). MLB easily meets the third test based on its state and local funding and federal regulatory position. *See* Pl.'s Memo. 6-7; *Ludtke v. Kuhn*, 461 F. Supp. 86, 93 (1978) ("the City has 'rationed' out a highly valuable public resource to benefit primarily a single user").

MLB proffers *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) to evade the regulatory repercussions of its receipt of massive public funding, but *Halleck* recognized recently what this Court held long ago: "The short answer to [the public nexus] argument is that the public access channels are not the property of New York City. Nothing in the record here suggests that a

government (federal, state, or city) owns or leases either the cable system or the public access channels at issue here." *Halleck*, 139 S.Ct. at 1933; *Ludtke*, 461 F. Supp.at 94-95 (distinguishing *Jackson*). *Jackson* limits the public-function test, not the public-nexus test.

Colorado's nexus with MLB is even stronger than in *Ludtke*. Colorado's state legislature created a baseball district and made the designated area a corporate and political subdivision of the state, COLO. REV. STAT. § 32-14-104, with a Board of Directors appointed by Colorado's Governor with its Senate's consent. *Id.* § 32-14-106(2). Thus, MLB's membership contains state actors who cloak and burden the MLB every bit as much or more than the public garage in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 724 (1961).[8]

Indeed, MLB teams' stadium funding is about $6.7 billion, with an average of over seventy percent of the cost funded by states and municipalities, (including the outliers of the Boston Red Sox, Chicago Cubs, and Los Angeles Dodgers that were built 60 or even over 100 years ago with no public funding).[9] Baseball gets more government funding that any other US professional sport. As explained in an analysis by the Brookings Institute, MLB receives a 26% higher average government subsidy relative to the other sports.[10] The report also noted the federal tax benefits afforded to MLB teams:

> When the New York Yankees completed the new Yankee Stadium in 2009, the final construction bill was an estimated $2.5 billion. Of that, nearly $1.7 billion was financed by tax-exempt municipal bonds issued by the city of New York.

---

[8] Notably, the All-Star Game is a unique event. Unlike other MLB events, players are selected from all 30 teams. A special fund is set up for its revenues. (Major League Constitution, ECF No. 32-1, Art. III, §6(g)). The Commissioner has specific authority for initial site selection of the All-Star Game. Id. at Art. III, §6(f). Thus, with regard to the All-Star Game, the MLB truly functions under its entire collective.

[9] *See* Sports Facility Reports on Major League Baseball, Appendix 1, to Sports Facility Reports, Volume 21, Research completed as of July 15, 2020, by National Sports Law Institute of Marquette University Law School (Exh. D).

[10] Alexander K. Gold, Austin J. Drukker, and Ted Gayer, *Why the federal government should stop spending billions on private sports stadiums* (Brookings Inst. Sept. 8, 2016) (Exh. E).

> Because the interest earned on the municipal bonds is exempt from federal taxes, a large amount of tax revenue that would have been collected—had the bonds been issued as taxable—went toward the construction of the stadium. **In other words, the Yankees received a federal subsidy to build their stadium. How much? About $431 million. That's a lot of money, but it gets worse.**
>
> **The loss in federal tax revenues was even higher than the subsidy to the stadium.** High-income taxpayers holding the bonds receive a windfall tax break, resulting in an even greater loss of revenue to the federal government. In the case of Yankee Stadium, the additional loss was $61 million. That is, the federal government subsidized the construction of Yankee Stadium to the tune of $431 million *federal* taxpayer dollars, and high-income bond holders received an additional $61 million.

*Id.* (emphasis added). While MLB understandably seeks to evade the regulatory burden of its governmental relationships, this Court should reject that.

### 2.   Discrimination based on Georgia residence is class-based discrimination, and defendants showed class-based animus.

Although JCN made out a case for unlawful discrimination against Georgia residents, Pl.'s Memo. 8-15, Defendants battle the strawman of class-based animus against Atlanta-area businesses and even cavalierly admit a disparate impact—unintended, they claim—on Black residents of the Atlanta metropolitan area. MLB Opp'n 14-15. JCN submits that MLB has not only waived any defense against its class-based animus against Georgians, *City of New York v. Minetta*, 262 F.3d 169, 181 (2d Cir. 2001) (parties waive arguments by failing to respond), but also left this Court free—in remedying that intentional disparate treatment—to cure the disparate impact on Black Atlantans *caused* by MLB's unlawful disparate treatment of Georgians.

Any number of decisions hold that a disparate impact, *standing alone*, does not qualify as intentional, class-based discrimination. *Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980); *Floyd v. City of New York*, 813 F. Supp. 2d 417, 452 (S.D.N.Y. 2011) ("statistical evidence … strong enough to show a disparate impact … is likely not strong enough to show

discriminatory purpose standing alone"). For example, in *Pers. Adm'r v. Feeney,* 442 U.S. 256, 279 (1979)*,* the passed-over female civil servant alleged that a state veteran-preference law for civil-service promotions discriminated based on sex. Because women then represented less than two percent of veterans, *id.* at 270 n.21, men were more than *fifty times* more likely to benefit from that state law. Nonetheless, the law did not discriminate *because of sex* when it acted based on another, *permissible* criterion (veteran status). *Id.* at 272. The main difference between Defendants here and Massachusetts there is that Massachusetts had a lawful basis for its action. Defendants do not, as they have conceded by failing to challenge the arguments that JCN actually raises.

Given Defendants' lack of a lawful justification, this Court's equitable powers to *remedy* MLB's unlawful discrimination are quite broad: "'The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 151 (2d Cir. 2016) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). Because MLB's disparate impact on Black Atlantans does not "stand alone," this Court can consider that impact in deciding how to remedy MLB's misconduct.

### 3.    Defendants' boycott of Georgia qualifies as "regulation."

Citing *Tracy*, MLB argues that the dormant Commerce Power applies only to taxation and regulation, MLB Opp'n 21, but this argument merely reprises Defendants' flawed state-actor argument. When state actors engage in boycotts—which is what Defendants have done to Georgia—courts call such actions "regulation." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 371-72 (2000) (invalidating Massachusetts law against spending Commonwealth funds with companies that do business with Burma). Although *Crosby* involved federalism in the form of state versus federal power under a federal law on Burma sanctions, *id.* at 373-74, the principle is the same in this effort by state actors to boycott a sister state. *See* Pl.'s Memo. 11-13, 15. The

constitutional authorities on which JCN relies prohibit state actors without a regulatory concern in the object of the state action—here, voting in Georgia—from boycotting other states.

### 4.      Plaintiff is likely to prevail on its claims under the KKK Act

Section 1985(3) aids JCN's claims by adding private conspiracies to the range of conduct that protect Americans from conspiracies against civil rights. "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Here, Defendants acted with political animus against Georgia, as publicly stated and admitted, which undisputedly also has a disparate impact on the black populations.  This violates the statute.  *See Hobson v. Wilson*, 737 F.2d 1, 24 (D.C. Cir. 1984) ("Section 1985(3) was 'intended, perhaps more than anything else, to provide redress for victims of conspiracies impelled by a commingling of racial and political motives.") Moreover, under the Hindrance Clause, state action is not required for private conspiracies—like Defendants' conspiracy—against the state itself.

### a)      Plaintiffs properly allege conspiracy.

To sufficiently allege a conspiracy under 42 U.S.C. § 1983 and § 1985(3), a plaintiff "must show with at least some degree of particularity, overt acts which the defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Coggins*, 988 F.Supp.2d at 248; *see also Smith v. Burge*, 222 F.Supp.3d 669, 687 (N.D. Ill. 2016) ("To sufficiently allege a conspiracy claim under federal law, Plaintiff must set forth the parties to the conspiracy, the purpose of the conspiracy, and the approximate dates of the conspiracy.").  In other words, the "W" questions: Who were the conspirators? What actions did they take in furtherance of the conspiracy? Why or for what purpose did they conspire? When approximately did they conspire?

Plaintiffs have more than met that standard. The co-conspirators identified are the

Defendants MLB, MLB Commissioner Manfred, the MLBPA, and MLBPA Executive Director Clark, as well as additional as yet unknown individuals or businesses. The Defendants took the overt actions of meeting or conferring to discuss and then decide to take the All-Star Game away from Atlanta; this overt act of moving the All-Star Game has occurred. The purpose of the conspiracy was to move the game to impose economic harms on Georgia's citizens and businesses, including Plaintiff and its Atlanta-area members, and thereby deprive them of their civil rights and the benefits of hosting the All-Star Game. The overt acts of the co-conspirators occurred, at a minimum, form March 26, 2021, when SB 202 was passed, through April 6, 2021, when the All-Star Game was moved from Atlanta to Denver. *See generally* Compl. ¶¶ 32-38.

A plaintiff is not, however, "required to list the place and date of defendants['] meeting and the summary of their conversation when he pleads conspiracy." *Cooper v. City of New York*, 2019 WL 3642996, at *5 (E.D.N.Y. Aug. 5, 2019) (citation and quotation marks omitted).  Instead, "the pleadings must present facts tending to show agreement and concerted action." *Id.*  Plaintiff have pled facts that meet this standard, and this Court should not require more as "[s]uch conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct evidence." *Id.* (citation and quotation marks omitted).

### b) <u>Defendant Manfred exceeded his authority.</u>

Plaintiff does not dispute that, under the currently effective version of the Major League Constitution, the Commissioner (with approval of the Executive Council) may make initial site selection decisions for the All-Star Game.  ECF No. 31-2, Major League Constitution, Art. III, §6(f) ("[t]he host Club for an All-Star Game (and all related events) shall be selected by the Commissioner and approved by the Executive Council.").  But that is not what occurred on April 2, 2021, when the MLB Commissioner took the game away from Atlanta.  The host club for the 2021 All-Star Game, the Atlanta Braves, was selected in July 2019 after a nearly two-year effort

to win the game starting in 2017 after the opening of Truist Park.

The Major League Constitution provision cited by MLB, Article III, Section 6(f), does not authorize the MLB to change the site of game or take the game away from the host club after it has been selected. The MLB constitution's silence with respect to the Commissioner's authority to change the site of the All-Star Game can only be read as a deliberate denial of that authority because in the ***immediately preceding paragraph***, Article III, Section 6(e), the Commissioner is ***expressly granted the authority*** to change the site of other games outside the regular season schedule. *See id.*, Art. III, §6(e) (where the Commissioner deems "any ballpark not suitable for the playing of Spring Training, Championship Season or Postseason games," then the Commissioner may "change the site of the game and/or adjust the schedule of future games."). Notably, this authority to change the site of the game is limited to one specific circumstance and is not a plenary grant of authority to the Commissioner that the MLB would have this court read into the provision governing the All-Star Game.

The MLB Commissioner's punitive actions against Atlanta also cannot be justified based on his disciplinary authority under Article III, Section 4(o). Under paragraph (3) thereof, for "conduct by organizations not parties to the Constitution … that is deemed not to be in the best interests of baseball," the Commissioner is authorized to:

> [P]ursue appropriate legal remedies, advocate remedial legislation, and take such other steps as the Commissioner may deem necessary and proper in the interests of the game of Baseball.

Major League Constitution, Art. III, §4(o)(3). While the term "necessary and proper" have a broad meaning, as under the United States Constitution, they cannot authorize actions that themselves violate the United Constitution (namely, the civil rights and civil conspiracies alleged in the Complaint) or other actions that are *ultra vires* actions under the Major League Constitution like moving the All-Star Game. Notably, the specific actions listed – pursuing legal actions or

advocating remedial legislation – are not the paths MLB chose to pursue. Instead, the Commissioner chose to crush thousands of small Atlanta businesses through unconstitutional and tortious means.

5. **Plaintiff is likely to prevail on its claims under § 1983.**

Section 1983 relies on MLB's status as a state actor, but it does not require a conspiracy against any violation of federal rights. But even without resort to civil-rights legislation, JCN is likely to vindicate its rights and those of its members by injunction: "[T]wo [post-Civil War] statutes, together, after 1908, with the decision in *Ex parte Young*, established the modern framework for federal protection of constitutional rights from state interference." *Perez v. Ledesma,* 401 U.S. 82, 106-07 (1971). First, the Civil Rights Act of 1871, 17 Stat. 13, provided what now are 42 U.S.C. §§ 1983, 1985 and 28 U.S.C. §1343. *Id.* Second, the Judiciary Act of 1875, 18 Stat. 470, provided what now is 28 U.S.C. §1331. *Id.* Even without resorting to the Civil Rights Act, JCN can enjoin an "ongoing violation of federal law" under *Young. See Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). The primary differences are the availability of an attorney-fee award for claims under 42 U.S.C. §§ 1983, 1985, *see* 42 U.S.C. § 1988(b), versus the lower burden of proof under *Young. See Blessing v. Freestone,* 520 U.S. 337, 340 (1997) ([i]n order to seek redress through §1983, ... a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law*") (emphasis in original). Because JCN's claims involve clear federal rights, the Court could enter an injunction under either line of authority, leaving the attorney-fee question for later.

B. **Plaintiff is likely to prevail on tortious interference with a contract, business relationship, and promissory estoppel.**

On April 2, 2021, less than three months before the scheduled Game, the MLB and the MLBPA Defendants purposefully, deliberately, and intentionally cancelled the July 13, 2021, All-

Star Game in Atlanta, Georgia.  The MLB and MLBPA Defendants, less than a week later, on April 6, 2021, announced their decision that the Game would take place in Denver, Colorado.  The MLB and MLBPA Defendants cancelled the All-Star Game in Atlanta two days after President Joseph Biden issued a press conference on March 31, 2021, demanding the MLB move the Game, with deliberate intent to hurt and punish the small businesses of Georgia –only after the passage of a law passed through the Democratic process, the Election Integrity Act.  There can be no question as to Defendants' malicious intent to harm Atlanta businesses.

Defendant MLB argues that Plaintiff must identify the specific contracts that were lost. But its support for that argument is off point. *Bose v. Interclick* is completely inapplicable to the case at bar because the issues discussed therein were under the Computer Fraud and Abuse Act, and the damages claimed were essentially speculative, or even unfounded; nevertheless, this court can take judicial notice of the significant operations of the Major League Baseball and the "benefits that hosting the All-Star Game" bring to a host city.

As Plaintiff argued in its motion, "Quantum meruit and unjust enrichment are not separate causes of action' and are therefore analyzed under the same principles." *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*, 159 F. Supp. 3d 324, 337 (E.D.N.Y. 2016) (quotation marks omitted); *see also Vinifera Imps. Ltd. v. Societa Agricola Castello Romitorio SRL*, 2020 U.S. Dist. LEXIS 43374, *26-29 (E.D.N.Y. 2020) (Court recognized that plaintiff sought to recover "for the substantial time and effort it expended to build and promote good will toward defendant's products and to increase the sales of its products."); *L. Fatato, Inc. v. Miller Brewing Company*, 582 F. Supp. 1377 (E.D.N.Y. 1984).

Plaintiff pleads that the alleged interference was unjustified, but it also is a matter of public record—subject to judicial notice—that a host city for an All-Star Game gets benefits as Defendant

MLBPA has argued.  Further, it can also be recognized that the total sum is unquantifiable, which is why Plaintiff seeks injunctive relief.

## III.      THE REMAINING *CITIGROUP-WINTER* FACTORS FAVOR PLAINTIFFS.

### A.      Plaintiffs are likely to suffer irreparable harm without preliminary relief.

Defendants do not dispute that—if JCN correctly argues the merits—irreparable harm flows automatically from the constitutional violations.

### B.      Defendants lack a countervailing equitable harm under the unclean-hands doctrine.

Equitable principles do not shield the deliberate and intentional wrongdoing the Defendants' perpetrated.  The "doctrine of unclean hands," is "that the equitable powers of this court can never be exerted on behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abettor of iniquity." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 846 F.3d 35, 56, (2d Cir. 2017) (*citing PenneCom B.V. v. Merrill Lynch & Co.*, Inc., 372 F.3d 488, 493 (2d Cir. 2004) (quotation marks, brackets, and citations omitted). Significantly, this equitable doctrine equally bars Defendants from making equitable defenses, *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d at 493, which bars the defense of laches.

Defendants suggest that Denver, Colorado is somehow a good faith benefactor of this misconduct, but by no means is this accurate.  After MLB announced the cancellation of the Game in Atlanta on April 2nd, the Governor of Colorado sprang into action desperately trying to capitalize on Georgia's misfortune:

> The Governor knows that Colorado is the best home for the All-Star Game, especially because Colorado also has strong laws that enable voters to cast their legal ballots any way they choose including through mail or in person. The Governor will be burning up the phones the next few days to see if there is an opening to bring the All-Star game to Denver.

Will Peterson, *Gov. Polis will be 'burning up the phones' to bring MLB All-Star Game to Colorado,* 9News, April 4, 2021 (Exh. F).  Denver has no one to blame but itself for any misfortune it may suffer by having the All-Star Game restored to Atlanta.  It should have never taken the Game in the first place, let alone actively lobby for it.  Its hands are unclean, and it therefore cannot be heard in equity.

        **C.**      **The public interest favors Plaintiff.**

The public interest merges with the merits, on which JCN is likely to prevail. Defendants do not have a countervailing public interest in acting illegally, no matter how strongly they feel.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be granted.

Dated: June 8, 2021                    Respectfully submitted,


                                       */s/ Howard Kleinhendler*
                                       Howard Kleinhendler
                                       HOWARD KLEINHENDLER ESQUIRE
                                       369 Lexington Avenue, 12th Floor
                                       New York, New York 10017
                                       (917) 793-1188
                                       howard@kleinhendler.com

                                       *Counsel for Plaintiff*