L6AGjobC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JOB CREATORS NETWORK,

                    Plaintiff,

            v.                          21 Civ. 04818 (VEC)

OFFICE OF THE COMMISSIONER OF
BASEBALL, et al.,
                                        Conference

                    Defendants.

------------------------------x

                                        New York, N.Y.
                                        June 10, 2021
                                        3:00 p.m.

Before:

                    HON. VALERIE E. CAPRONI,

                                        District Judge

                        APPEARANCES

HOWARD KLEINHELDER ESQUIRE
      Attorney for Plaintiff
BY:  HOWARD KLEINHELDER

SULLIVAN & CROMWELL, LLP
      Attorneys for Defendant
BY:  JOHN L. HARDIMAN
      BENJAMIN WALKER

WINSTON & STRAWN LLP.
      Attorneys for Defendant
BY:  JEFFREY L. KESSLER
      DAVID GREENSPAN

L6AGjobC

1          (In open court)

2          THE DEPUTY CLERK:  In the matter of Job Creators

3    Network v. Major League Baseball, et al, 21 Civ. 4818.

4    Counsel, please state your appearance for the record.

5          MR. KLEINHENDLER:  Good afternoon, your Honor.  Howard

6    Kleinhendler for the plaintiff.  And with me is Mr. Alfredo

7    Ortiz, the CEO of Job Creators Network.  And with him is one of

8    his counsel, Abigail Frye.

9          THE COURT:  Good afternoon, Mr. Kleinhendler,

10   Mr. Ortiz, and Ms. Frye.

11         MR. HARDIMAN:  Your Honor, John Hardiman from Sullivan

12   and Cromwell representing Major League Baseball and

13   Commissioner Manfred.  And this is Ben Walker from my office

14   working with me on the matter.

15         THE COURT:  Good afternoon, Mr. Hardiman.

16         MR. KESSLER:  Good afternoon, your Honor.  Jeffrey

17   Kessler from Winston & Strawn on behalf of the Major League

18   Baseball Players Association.  My partner, David Greenspan, to

19   to my right.  And my client, Bruce Meyer, who is the chief

20   labor counsel for the MLBPA is behind me.

21         THE COURT:  Good afternoon, Mr. Kessler and

22   Mr. Greenspan, and Mr. Meyer.

23         MR. KESSLER:  I'm also appearing for Tony Clark as

24   well, your Honor.

25         THE COURT:  Thank you.  Please be seated.

L6AGjobC

| | |
|---|---|
| 1 | Mr. Kleinhendler, this is your motion. |
| 2 | MR. KLEINHENDLER:  Thank you, your Honor.  The facts |
| 3 | here, your Honor, are not in dispute.  In 2019, Major League |
| 4 | Baseball announced that in 2021, the All Star Game would be |
| 5 | played in Truist Park, the Atlanta Braves' home field in Cobb |
| 6 | County, Georgia.  That announcement, your Honor, was not |
| 7 | conditional.  Mr. Manfred didn't say, in 2019, we will play the |
| 8 | All Star Game in 2021 if you don't cast any laws that we're |
| 9 | upset with, if you don't do anything terrible.  Between |
| 10 | July 2019 and March 26th, 2021, the All Star Game was going to |
| 11 | be played at Truist Park.  But then the State of Georgia, |
| 12 | through its duly elected legislature, signed the election |
| 13 | integrity act, they signed a voting law.  Six days later, on |
| 14 | April 2nd, Major League Baseball announced that they were |
| 15 | withdrawing the game from Atlanta.  And they weren't shy about |
| 16 | it.  They said, we are withdrawing this game because we don't |
| 17 | like your election law. |
| 18 | Four days later, they announced the game is going to |
| 19 | Denver, Colorado.  The game is currently scheduled to be played |
| 20 | on July 13th. |
| 21 | For 21 months, your Honor, businesses in Georgia and |
| 22 | the Atlanta area were planning, preparing, budgeting, spending |
| 23 | money, getting ready for the All Star Game.  And we have in our |
| 24 | reply papers an affidavit from Mr. Christopher Florence, who |
| 25 | had a women's softball league.  For two years, between 2019 and |

L6AGjobC

1    2021, he was preparing for his world conference series, where

2    he was expecting 80 teams to arrive to the Atlanta area.  These

3    are women or girls between 10 and 18 who participate in a

4    series.  The opening ceremonies of this series was going to be

5    played in Truist Park, because the All Star Game, your Honor,

6    is a three-day affair; there's a minor league game, then

7    there's a sluggers fest, and then there's the game.  And the

8    opening ceremonies were going to be during one of those events

9    at Truist Park.  As soon as Major League Baseball announced

10   they're pulling the game, half the teams said, we're not

11   coming.  If there is no All Star Game, we're not coming to

12   Atlanta.  This man is a member of JCN, he articulates a

13   70 percent drop in revenue, a concrete injury.

14           THE COURT:  But it's a concrete injury that's already

15   occurred.

16           MR. KLEINHENDLER:  Correct.  But the injury is

17   ongoing, because if the game comes back, he will be able to

18   remedy the situation.

19           THE COURT:  That doesn't make it an ongoing injury.

20           MR. KLEINHENDLER:  Well, the ongoing injury is still

21   the injury to the other businesses who can't get back on their

22   feet.  They lost the revenue.  They lost all of their --

23           THE COURT:  Just to be clear, the only affidavit I

24   have -- and there are no factual allegations in the

25   complaint -- but assuming that you can amend your complaint via

L6AGjobC

1    an affidavit submitted in your reply papers, which is not the

2    rule, all these other businesses, there's nothing in here from

3    other businesses about injuries.

4              MR. KLEINHENDLER:  Your Honor, we are asserting the

5    claim as an organization.

6              THE COURT:  Understood.  So let's talk about JCN.

7              MR. KLEINHENDLER:  Let's talk about JCN, they are

8    representing 3,600 businesses, and they have asserted that

9    these injuries will be ongoing.

10             THE COURT:  I am aware of that.

11             MR. KLEINHENDLER:  Okay.

12             THE COURT:  So let's talk about JCN.  What exactly is

13   the mission of JCN?

14             MR. KLEINHENDLER:  The mission of JCN is to educate,

15   lobby, assist small businesses to create jobs, Job Creators

16   Network.  They are there to serve as a voice for the small

17   business people.  Your Honor, an organization like JCN protects

18   and insulates small businesses that suffer economic harm but

19   are afraid to become plaintiffs.  That was true of the NAACP

20   and other organizations that had standing when small black

21   businesses were afraid to sue.  So organizations such as JCN

22   are the voice of small businesses.

23             THE COURT:  There's no question that an organization

24   can have organizational standing.  What I'm trying to figure

25   out is which bucket of organizational standing you purport to

L6AGjobC

1    the bring this lawsuit in.

2              MR. KLEINHENDLER:  Your Honor, I argue in two buckets.

3    One is the regular membership organization bucket, and in

4    the --

5              THE COURT:  Meaning you are suing on behalf of

6    yourself?

7              MR. KLEINHENDLER:  No.  Separately, I'm suing on

8    behalf of my members.  I also have my own ongoing injury.

9              THE COURT:  Let's talk about JCN.  Let's deal with

10   these one at a time.  How was JCN injured?

11             MR. KLEINHENDLER:  It had to divert resources, your

12   Honor.

13             THE COURT:  Again, let's go back to the mission.  So

14   what is the mission -- according to your website and sort of

15   what you just said, Mr. Ortiz's affidavit describes the mission

16   as educating employees of Main Street America in order to

17   protect those that depend on the success of small businesses.

18   So I assume by "Main Street America," you're talking about

19   small businesses?

20             MR. KLEINHENDLER:  Correct.

21             THE COURT:  So that is part of the mission.  And the

22   second part of the mission is amplifying members' stories to

23   educate policymakers about the consequences of bad policy.

24   That's how Mr. Ortiz describes the mission --

25             MR. KLEINHENDLER:  Correct.

L6AGjobC

1          THE COURT:  -- in Paragraph 7 of his affidavit.  So

2     you agree with that?

3          MR. KLEINHENDLER:  Yes.

4          THE COURT:  So how has that mission been at all

5     impinged?  You say you're diverting resources, but part of your

6     mission seems to be to amplify the purported grievances of

7     small businesses.  So isn't this like right in your wheelhouse?

8          MR. KLEINHENDLER:  Your Honor, it's in our wheelhouse,

9     to the extent that we want to help businesses make more money.

10    But it's not in our wheelhouse to pick people that have been

11    trampled by constitutional violations off the ground and try to

12    make sure they have food to feed their families.  Even if that

13    is part of our mission, we have to devote extraordinary amounts

14    of resources to this small area of our national scope because

15    we now can't help people, let's say, in Phoenix or Texas

16    because we have to take our resources and devote it now to

17    Atlanta.

18         THE COURT:  Are you giving direct grants to small

19    businesses that have been harmed by Major League Baseball

20    moving the All Star Game?

21         MR. KLEINHENDLER:  We don't give direct grants.

22         THE COURT:  So what you do is take out ads and create

23    billboards; right?

24         MR. KLEINHENDLER:  We take out ads, we create

25    billboards.

L6AGjobC

```
 1          THE COURT:  But that's your mission, that's what you
 2   do?
 3          MR. KLEINHENDLER:  Your Honor, yes, that's what we do.
 4   But when we have a catastrophe, we have to stop helping
 5   everybody and we have to now focus on only a very, very small
 6   portion, which diverts resources locally, which ordinarily
 7   would be spread out all over.
 8          THE COURT:  So essentially, you're saying, this is the
 9   mission.  It's just you think you're harmed because the
10   particular policy that you have decided is bad and bad enough
11   to get your attention primarily affects only businesses in the
12   Atlanta area?
13          MR. KLEINHENDLER:  Correct.
14          THE COURT:  And therefore, you're injured because
15   you're focusing on Atlanta small businesses, as opposed to
16   small businesses across the country?
17          MR. KLEINHENDLER:  Correct, correct.
18          And let me just get --
19          THE COURT:  But you have taken on local issues before?
20          MR. KLEINHENDLER:  Correct.
21          THE COURT:  So it's still sort of generally within the
22   wheelhouse of JCN to take on local issues that have an adverse
23   impact on small businesses?
24          MR. KLEINHENDLER:  100 percent.  That's why we fit
25   right into the Hunt factors.  Because what we're doing is
```

L6AGjobC

totally consistent with our mandate, with what our mission is.
That's the first Hunt factor, your Honor.  The second Hunt
factor is we're very close to our members.  And we articulated
that in the reply memorandum.  They come to our board meetings.
They have total access to us through a host of communications.
That allows us to step forward -- putting aside our direct
injury -- and assert their injuries.

Now, I just want to get back to one question you said;
the ongoing injury.  There is an ongoing injury to the softball
team.  They're still bleeding money.  They're still losing
money, because they can't get teams to their tournament.  So
it's not, oh, your losses have been stopped.  These losses are
ongoing.  If the game comes back, the losses go away.  So there
is an ongoing loss with Mr. Florence, which is right before
you.  And he's just one example.

THE COURT:  How is it going?  I thought you told me
everybody canceled.

MR. HARDIMAN:  Half the teams canceled.

THE COURT:  And half the teams are coming?

MR. KLEINHENDLER:  Half the teams are coming.

THE COURT:  So mazel tov.  He's got at conference.

MR. KLEINHENDLER:  But his injury is ongoing because
number one --

THE COURT:  No, his injury has happened.  He's not
going to make as much money as he thought he was going to make;

L6AGjobC

1    right?

2              MR. KLEINHENDLER:  And he might still lose more money.

3              THE COURT:  You haven't alleged that.  How?

4              MR. KLEINHENDLER:  Because more teams may drop out,

5    because once they see we're going from 80 to 40, it can drop to

6    30 and 20.

7              THE COURT:  And there could be a hurricane and no one

8    would come.

9              MR. KLEINHENDLER:  Well, the point here is there was a

10   constitutional violation.

11             THE COURT:  We'll get to the constitutional violation

12   in just a second.

13             So beyond the single affidavit from Mr. Florence, what

14   other factual information have you given me to show that

15   members of JCN have been harmed?

16             MR. KLEINHENDLER:  I've given you Mr. Ortiz's

17   affidavit.

18             THE COURT:  But Mr. Ortiz doesn't have anything

19   specific either, I don't believe.

20             MR. KLEINHENDLER:  He talks about the various types of

21   members that have been -- in his moving after -- he talks about

22   various different businesses that were harmed.

23             THE COURT:  Like who?

24             MR. KLEINHENDLER:  He talks about a limo driver.  He

25   talks about --

L6AGjobC

1            THE COURT:  He doesn't say he's a JCN member.

2            MR. KLEINHENDLER:  Other than, at this point,

3    Mr. Florence, we haven't identified any specific members.  But

4    we have identified the types of members that were hurt.

5            THE COURT:  But you haven't closed that loop.  That

6    is, you have identified the type of businesses in Atlanta that

7    might be harmed by the movement of the All Star Game.  But you

8    haven't connected that those businesses or even those types of

9    businesses, specifically, are members of JCN.  I mean, I think

10   you just want me to speculate that you have members beyond

11   Mr. Florence who actually suffered any kind of an adverse

12   impact of the move of the game.

13           MR. KLEINHENDLER:  Your Honor, Mr. Ortiz, in his

14   affidavit described the type of business.  Correct, we haven't

15   pro haec verba identified all the businesses.  But guess what,

16   it doesn't matter.  One is enough.  One injury is enough for

17   standing.  We're talking about standing now.  We're talking

18   about standing for injunctive relief.  One injury is enough.

19   And I think I would submit to you that Mr. Florence's injury is

20   detailed, he's a member, it's articulate, and it's clearly

21   100 percent related to pulling the All Star Game.  So we

22   have --

23           THE COURT:  Why don't we talk about what the actual

24   claim is.

25           MR. KLEINHENDLER:  Okay.  So your Honor, the claims

L6AGjobC

1   fall into two buckets; constitutional claims and state law

2   claims.  The constitutional claims further get divided into two

3   parts; claims that are dependent on whether Major League

4   Baseball is a state actor and a claim that is not dependent on

5   whether Major League Baseball is a state actor.

6           So let's start with the threshold issue; is Major

7   League Baseball a state actor?  Yes.

8           Why?  So first, let's talk about the All Star Game.

9   This is not Yankees versus Mets, subway series, where there are

10  only two teams involved.  This is the All Star Game.  The All

11  Star Game is specifically discussed in the MLB charter.  All

12  money from the All Star Game goes to one central fund for the

13  MLB.  All teams must send players to the All Star Game.  So all

14  the teams, in effect, contribute to the All Star Game.  We have

15  case law from this court, to begin with, that says New York

16  Yankees are a state actor.

17          THE COURT:  You're talking about the *Ludtke* case?

18          MR. KLEINHENDLER:  Yes.

19          THE COURT:  That is not what that case holds.  That

20  case is entirely distinguishable.  So Yankee Stadium is owned

21  by the City.  Under the lease agreement, the Yankees were

22  obligated to comply with local law.  The City wasn't requiring

23  them to comply local law when they allowed women to be excluded

24  from the locker room.  That's not this case.  Similarly, the

25  other case you cited, the *Lewis* case, the Coors Field case is

L6AGjobC

1    also entirely distinguishable.

2              MR. KLEINHENDLER:  Your Honor, we're talking about

3    teams that if you ask the question, is there an entwinement

4    between the local governments and the team, which is the test,

5    there is a local --

6              THE COURT:  It's more involved than that, but okay.

7              MR. KLEINHENDLER:  The local involvement manifests

8    itself in the following ways:  Extraordinary amounts of public

9    funding for the stadiums.  We attached in my papers, your

10   Honor, a compendium showing how many teams, what kind of money

11   they get.  I counted 14 teams that get 70 percent of their

12   stadium public funding, five of them are a hundred percent.

13   That public funding comes with strings attached, as articulated

14   in the articles in our compendium.  They have to charge tax for

15   ticket sales that go to the municipality.  They --

16             THE COURT:  Do you have any cases that have taken your

17   theory, which is looking at the *Ludtke* case or looking at the

18   Lewis case, where it's a very specific thing that the team does

19   that's connected to a city owned stadium, any case that has

20   broadened that so that anything that a baseball team does,

21   regardless of where it's doing it, constitutes state action?

22             MR. KLEINHENDLER:  There's no case that says anything

23   a baseball team does.  That's why I started this argument by

24   talking about the All Star Game.  It's a unique event.

25             THE COURT:  But it doesn't specifically involve

L6AGjobC

government action.

MR. KLEINHENDLER:  It involves Major League Baseball.
And if Major League Baseball's teams are all, for the most
part, funded by billions and billions of dollars of state and
local money -- and many of those teams have obligations to
state governments, such as the state provides security, the
state levies taxes on ticket sales, on -- all of that.

And why do municipalities take on these burdens of
having to issue municipal bonds that they have to pay off that
they have to levy on or spread out among their taxpayers?  Why?
Because baseball brings a certain benefit to the city.

THE COURT:  That's what they think.  They think that
they bring in more than they cost.  But that still doesn't make
the beneficiary who uses the stadium a state actor.  Even if
you combine them all and look at it as Major League Baseball.

MR. KLEINHENDLER:  If a woman can sue to forcibly
enter the locker room during the World Series -- that case
didn't just sue the Yankees, it sued the commissioner --
because it was a commissioner of baseball decision, it wasn't a
Yankee decision, it was a commissioner of baseball decision
that no women were going to come into the locker room.  And
what the court said is, well, you baseball, you commissioner of
baseball, you are bound by what obligations Yankee Stadium has.
Now, when you say, well, Yankee Stadium is simply owned by New
York, okay, several other stadiums are owned by states.  And

L6AGjobC

1    therefore, these teams become infused with the obligations of

2    state actors.  And the question is -- what I want to argue to

3    you, your Honor, is we only need one state actor to cause the

4    entire MLB at the head to be considered a state actor, because

5    the MLB is an unassociated corporation.  It does not exist.  It

6    exists as part of its members -- are what it is.  And because

7    this is a collaborative event, the All Star Game, all you need

8    is one member to be a state actor and MLB is stuck with that

9    state actor responsibility.  That's argument one, okay.

10         Argument two is, no, I don't have a specific case, but

11   I've got a five-part test from the Second Circuit that was

12   broke down in *Ludtke* that informs courts what is considered a

13   state actor.  So let's just look at that.

14         One, the private entity's degree of dependence on the

15   government.  Major League Baseball is out of business without

16   these government subsidies.  Over 70 percent of their stadiums

17   receive over 50 percent public funding.

18         THE COURT:  They could make their own stadiums.

19   That's why there is public dispute over whether stadiums should

20   be funded with bond dollars is because Major League Baseball

21   has more money than -- I'm sure there's an expression there --

22   they could build their own stadiums.

23         MR. KLEINHENDLER:  Your Honor, but the fact is --

24         THE COURT:  I know you all don't like that, but

25   it's --

L6AGjobC

1          MR. KLEINHENDLER:  The fact is they don't.

2          THE COURT:  But you said they would be out of

3     business.  They would not be out of business.  They would just

4     have to reach into their pockets.  Some of those players may

5     not make as much money -- they're not going to like that over

6     there -- but they could do it.

7          MR. KLEINHENDLER:  Right now, when we're speaking,

8     their dependence on governmental aid is substantial.

9          THE COURT:  Have you ever heard the expression sucking

10    at the public tit?

11         MR. KLEINHENDLER:  Yes.

12         THE COURT:  That's what they're doing.  It doesn't

13    mean they're dependent on it.  It means they got the benefit of

14    it.

15         MR. KLEINHENDLER:  Two, the extent of intrusiveness of

16    government regulation.  All these ballparks are subject to

17    public security.  Some of the ballparks -- as we said, in

18    Colorado, we cited the statutory -- there are statutes that say

19    that the ballpark area is part of the state, in Colorado, for

20    example.

21         THE COURT:  Right.

22         MR. KLEINHENDLER:  Whether or not aid is given to all

23    similar institutions.  No.  We pointed out to you that

24    football, basketball, hockey gets far less aid than baseball.

25    And guess what, none of them have the antitrust exemption that

L6AGjobC

1    baseball has.

2           Whether or not the institution performs a public

3    function.  I would argue it does.  This is baseball.  It

4    provides an outlet for youth.  It provides an emolument to the

5    cities that have these stadiums.  That's why the stadiums can

6    say, listen, I want a $50 million makeover for my stadium or I

7    pick up and I leave.  Why do they have such leverage over these

8    cities?  Because these cities need these stadiums to feed the

9    local businesses, to bring in businesses, to bring in the type

10   of residents that they want to have in their city.  So I would

11   argue to you, your Honor, that there is a tremendous public

12   function served by baseball, right.  They call themselves the

13   national pastime.

14          And finally, the legitimacy of the organizations

15   claimed to be regarded as a private character.  Your Honor,

16   they don't act as a private character when they have the

17   ability to force municipalities to basically fork over tens of

18   millions of dollars or hundreds of millions of dollars to build

19   these stadiums.  And they have this federal antitrust exemption

20   that no one else has.

21          So my argument to you, your Honor, is when you look at

22   the five-factor test, you can conclude that baseball is a

23   public entity.

24          THE COURT:  Look, let's assume it is.

25          MR. KLEINHENDLER:  Okay.

L6AGjobC

1    THE COURT:  What's the constitutional violation?

2    MR. KLEINHENDLER:  We have two.  Violation number one

3    is 42 USC 1985, they call it the KKK act.  And that's where two

4    people conspire to either deprive or hinder people's rights.

5    The deprivation clause here is simple.  Your Honor, if Major

6    League Baseball had a theater --

7    THE COURT:  If Major League Baseball had what?

8    MR. KLEINHENDLER:  A theater, down the street.  And

9    they said, guess what, you're from Atlanta, you can't come into

10   my theater, I don't like your voting laws.  You're from

11   Colorado, I love your voting laws, you can come into my

12   theater.  That's a violation of equal protection.  That's a

13   violation of privilege of their immunities.

14   THE COURT:  What's the best case you have that says

15   that would be a violation of equal protection?

16   MR. KLEINHENDLER:  Okay, best case.  The NOW -- well,

17   that was the hindrance clauses National Organization of Women,

18   where people were blocking women from going into abortion

19   clinics and the court said that was a violation for equal

20   protection under 1985(3).  And it didn't even require a state

21   actor.

22   THE COURT:  But that was women, the group whose equal

23   protection rights were being deprived was women.

24   MR. KLEINHENDLER:  Here you are depriving --

25   THE COURT:  What is the group?

L6AGjobC

1          MR. KLEINHENDLER:  People from Georgia.

2          THE COURT:  Is there any case that says, residents of

3     a state are a group for equal protection purposes, any case?

4          MR. KLEINHENDLER:  There are cases that talk about

5     political affiliation, yes.

6          THE COURT:  That's political affiliation.  You're

7     talking about all residents of the State of Georgia.

8          MR. KLEINHENDLER:  All residents of the State of

9     Georgia have effectively been denied entrance to the movie

10    theater.

11         THE COURT:  No, they haven't.  They are welcome to fly

12    to Colorado to go to the game.

13         MR. KLEINHENDLER:  No, but they want the game in

14    Atlanta so they can make a living.

15         THE COURT:  Anybody who is dependent on one baseball

16    game over three days in the middle of the summer to make a

17    living, that's a problem.  But that's not your theory; right?

18         MR. KLEINHENDLER:  Your Honor --

19         THE COURT:  For the equal protection theory to work,

20    you need a group that's being discriminated against as compared

21    to another group that's otherwise similarly situated.

22         MR. KLEINHENDLER:  Correct.

23         THE COURT:  What's the group?

24         MR. KLEINHENDLER:  The group is Georgia citizens are

25    being discriminated against versus Colorado citizens.  Those

L6AGjobC

```
 1   are your two groups.  And that clearly fits into the privileges
 2   and immunities clause.  Because if Major League Baseball is a
 3   state actor, they're treating citizens of one state differently
 4   than they're treating citizens of another state.  They're
 5   saying, we are not going to provide our All Star Game to you in
 6   Georgia.  Why?  Because we don't like your laws.  But we will
 7   give it to Colorado.
 8             THE COURT:  They're not providing it to 48 other
 9   states also.
10             MR. KLEINHENDLER:  They're not providing it to 48
11   other states because they can only play it one year at a time.
12             THE COURT:  Correct.
13             MR. KLEINHENDLER:  But they promised it to us in
14   Georgia.
15             THE COURT:  This isn't a contract case.  You are not
16   the State of Georgia, you are not the Cobb County stadium.
17             MR. KLEINHENDLER:  This has nothing to do with
18   contracts.  This has to do with the small businesses in Atlanta
19   who spent money waiting for the game and lost all that money.
20   Why?  Because their government enacted a law.  That's a
21   constitutional violation when you're a state actor.  You can't
22   say, I'm going to treat you, Georgia, different than I'm going
23   to treat Colorado.  You can't do that, if they're a state
24   actor, unless you have a valid reason.  And saying, I don't
25   like your voting law is not a valid reason, because the voting
```

L6AGjobC

1    law is articulated in the Amicus, the voting law is a state

2    function.  And what they were complaining about is voter ID,

3    your Honor.  Voter ID has been held by the Supreme Court to be

4    a valid means of protecting voter integrity.  So they don't

5    have a valid reason for doing what they did.  And they

6    announced their reason.

7            You can't simply say, I'm going to hurt people in

8    Georgia by basically intimidating, taking away a financial

9    incentive, hurting them by making them lose money -- which is

10   what they did -- because I don't like your voting law.  And

11   guess what, I'm going to give it to Colorado.  Now, Major

12   League Baseball could say, your Honnor, we're not having an All

13   Star Game this year.  They don't have to be in the All Star

14   Game business.

15           THE COURT:  Well, wouldn't that harm the small

16   businesses in Georgia in exactly the same way that moving the

17   game to Colorado did?

18           MR. KLEINHENDLER:  Exactly right.  But your Honor,

19   that's the point.  If they said, you know something, we're not

20   having an All Star Game, we decided we don't want to have this

21   event, then we would not have a constitutional violation.  We

22   would still have our promissory estoppel violation, but we

23   wouldn't have a constitutional violation.  The fact that they

24   said, we're taking it from you, Georgia, and we're giving it to

25   Colorado, that's the constitutional violation.

L6AGjobC

1          THE COURT:  Well, let me ask you something.  Let's

2     suppose that baseball was going to expand again.

3          Do you all still expand periodically?

4          MR. HARDIMAN:  Yes, every now and then.

5          THE COURT:  I know more about baseball than I do about

6     soccer, but every once in a while you expand.  So are you

7     saying that Major League Baseball could not say, we have two

8     expansion teams, we're not going to give an expansion team to

9     state X, because state X has some type of state law that we

10    think is just not consistent with our values as a team, as an

11    industry, we'll go to this state because it doesn't have that

12    law?

13         MR. KLEINHENDLER:  If they have a valid reason.  Your

14    Honor, if they have a valid reason.

15         THE COURT:  So then you're just quarreling with their

16    rationale, that they thought the law was inconsistent with

17    their values?

18         MR. KLEINHENDLER:  Correct.  That is not a legitimate

19    reason.

20         THE COURT:  Why isn't it?

21         MR. KLEINHENDLER:  Why is it not a legitimate reason?

22         THE COURT:  You're not challenging their good-faith

23    basis.  As a good-faith matter, Major League Baseball says this

24    change in the law is not consistent with the values that we

25    want to respect or honor or whatever -- I don't have the exact

L6AGjobC

1    language, but whatever it was -- you're not contesting that

2    that wasn't in good faith.

3            MR. KLEINHENDLER:  I am.  Because in the complaint, I

4    say it was based on a bunch of inaccuracies.

5            THE COURT:  You're just saying they got it wrong?

6            MR. KLEINHENDLER:  They got it wrong.

7            THE COURT:  They misunderstood the law, but you're not

8    challenging their good faith; right?

9            MR. KLEINHENDLER:  I am challenging their good faith.

10           THE COURT:  What's the basis of your challenge to

11    their good faith?

12           MR. KLEINHENDLER:  Because they adopted a series of

13    characterizations about the law that they could have checked in

14    two seconds was not true.

15           THE COURT:  But again, you're just saying they're

16    wrong.  Look, people do things based on things that are wrong,

17    it happens.  There was an invasion of the Capitol, based on

18    just thinking something happened that didn't happen.

19           MR. KLEINHENDLER:  Okay.

20           THE COURT:  So people do things based on faulty

21    information.  You think Major League Baseball acted on faulty

22    information, on a faulty understanding of what the law is.

23    That's your theory of what makes it -- therefore, it was in bad

24    faith.  Therefore, because they're a state actor, from a

25    privileges and immunities perspective, they can't pick one

L6AGjobC

1    state over another.  Is that your theory?

2            MR. KLEINHENDLER:  Correct.  They cannot pick one

3    state over the other.

4            THE COURT:  Because they were wrong?

5            MR. KLEINHENDLER:  It doesn't matter whether they were

6    wrong.  It doesn't matter what their intention was.

7            THE COURT:  Wait a minute.  I'm sorry, I thought we

8    went down this rabbit hole because you acknowledged that for

9    expansion teams they could pick and choose between states.

10           MR. KLEINHENDLER:  No, I did not acknowledge that.

11           THE COURT:  They can't pick and choose between states?

12           MR. KLEINHENDLER:  Wait a second.  They can pick and

13   choose between states if they have a valid reason for picking

14   and choosing.  For example --

15           THE COURT:  If there was a state law that was just

16   anathema to the players of Major League Baseball, that wouldn't

17   be a valid reason?

18           MR. KLEINHENDLER:  Not if it's a legal law that goes

19   to voting rights, no.  No.

20           THE COURT:  So your theory is only cabined to Major

21   League Baseball can't weigh in on anything that has to do with

22   voting rights?

23           MR. KLEINHENDLER:  They can weigh in, but what they

24   can't do is they can't take punitive action against a state

25   that has enacted voting laws and then use that punitive action

L6AGjobC

1      to then benefit another state.  That's privileges and immunity.

2      What they could have done, what they could have done is

3      canceled the All Star Game.

4                  THE COURT:  Punish everybody?

5                  MR. KLEINHENDLER:  They can't punish everybody in a

6      single state.  They can punish everybody and say, look, I just

7      don't want to do an All Star Game today.  That's not a

8      constitutional violation.

9                  Let me put it this way.  Judge, I own a pizza shop,

10     okay -- this is the *Burton* case -- I own a coffee shop, a

11     minority walked in, I don't like that minority, I don't want to

12     serve them.  That's a violation.

13                 THE COURT:  That's correct, because you're

14     discriminating on the basis of race.

15                 MR. KLEINHENDLER:  But I could simply just say, I'm

16     not going to be in the coffee shop business anymore.

17                 THE COURT:  Absolutely.

18                 MR. KLEINHENDLER:  That's the story here with

19     baseball.

20                 THE COURT:  No, Mr. Kleinhendler, there's a difference

21     between discriminating against a person of color because

22     they're a person of color and the decision of an organization

23     to move a game from one state to another where the impact of

24     that decision is not -- as far as I can tell, it's not even

25     your argument -- that the impact of that decision is a

L6AGjobC

1   disparate impact on blacks, on whites, on men, on women.

2          MR. KLEINHENDLER:  Your Honor, we have made that

3   argument.

4          THE COURT:  What is the argument?

5          MR. KLEINHENDLER:  The argument that Atlanta is over

6   51 percent black and Colorado is only 9 percent black.

7          THE COURT:  So they intended to discriminate against

8   blacks?  Is that your theory?

9          MR. KLEINHENDLER:  I don't know what their intention

10  was.  But the result was discrimination against blacks, and

11  that's in the Jones Amicus, your Honor, and that's a fact.

12         THE COURT:  Again, you're suing on behalf of members

13  of JCN, so you haven't shown that there's a disproportionate

14  impact on minority members of JCN.  You haven't even alleged

15  that there are any minority members of JCN.

16         MR. KLEINHENDLER:  Your Honor, I haven't alleged that

17  X amount of members are minorities, but what I have alleged is

18  that my members are businesses in Atlanta.  My members were

19  hurt because the game left Atlanta.  And that --

20         THE COURT:  That's a conclusory allegation.  The only

21  factual allegation you gave me was about the softball

22  tournament.

23         MR. KLEINHENDLER:  But you don't need more than one.

24         THE COURT:  Just to be clear.

25         MR. KLEINHENDLER:  Yes.

L6AGjobC

1          THE COURT:  This entire case is brought on a single

2     softball tournament?

3          MR. KLEINHENDLER:  No.

4          THE COURT:  In terms of an actual factual allegation

5     of injury?

6          MR. KLEINHENDLER:  Yes, at this point, yes.  And the

7     point is, your Honor, I don't need more than that.  And the

8     fact is that Major League Baseball needs a valid reason not to

9     have -- for example, what if Major League Baseball says we're

10     not letting any players from Georgia, from the Braves

11     participate in the All Star Game, I would argue, your Honor,

12     that that would be a constitutional violation.  Because if the

13     reason they are not letting those Georgia players play is

14     because they don't like Georgia voting laws, then they

15     basically intimidated the people of Georgia.  They are treating

16     the people of Georgia differently than they're treating

17     everybody else in Major League Baseball.  And you can't do that

18     if you're a public actor.  You just can't.  And yeah, we don't

19     really have a lot of case law on this because this is a unique

20     situation.  But the principles of what I'm telling you are

21     strewn about in a lot of different Supreme Court cases that we

22     cited to you.

23          And there's another state actor issue here.  And that

24     is under 1983, the second part under 1983, we have a violation

25     of the dormant commerce clause because basically -- and because

L6AGjobC

1    basically, what's happening here is, they are telling the state

2    what type of election law you are allowed to enact, which is

3    basically like preclearance, which the Supreme Court has said

4    violates equal protection.

5         So yeah, they're a for-profit business, but if they

6    are a state actor and they are burdened with constitutional

7    requirements or constitutional duties, they must then live up

8    to the Constitution.  And they cannot say, Georgia, we treat

9    you one way because we don't like your voting laws.  But

10   Colorado, no problem, here's the All Star Game, we like your

11   voting laws.

12        Now with regard to 1983 and not a state actor, what

13   they're doing here that's wrong is they are intimidating the

14   Georgia legislature.

15        THE COURT:  The legislature has already acted.

16        MR. KLEINHENDLER:  Correct.

17        THE COURT:  You think their goal is to get Georgia to

18   change the law?

19        MR. KLEINHENDLER:  Of course.  Why else would they do

20   it?  What's the point?

21        THE COURT:  Let me ask you something.  You like the

22   law, right, your guys like the law?

23        MR. KLEINHENDLER:  I don't think --

24        THE COURT:  Your client thinks it was a good law?

25        MR. KLEINHENDLER:  Yes, we think it was a good law.

L6AGjobC

1          THE COURT:  They have a First Amendment right to think

2     that; right?

3          MR. KLEINHENDLER:  This has nothing to do with the

4     First Amendment.

5          THE COURT:  Do they have a First Amendment right to

6     propound that they believe the new Georgia voting law is a good

7     policy choice for Georgia?

8          MR. KLEINHENDLER:  If they don't hurt anybody with it,

9     then they're allowed to --

10          THE COURT:  So doesn't Major League Baseball have the

11     same right?

12          MR. KLEINHENDLER:  No.  Not when they take away the

13     economic benefits -- which everybody estimated as $100 million

14     everybody is waiting for -- that's a hindrance, your Honor.

15          THE COURT:  But it didn't hinder.

16          MR. KLEINHENDLER:  It did, they took it away.

17          THE COURT:  The law passed.

18          MR. KLEINHENDLER:  The law passed, but now they're

19     punishing the state for passing the law.

20          THE COURT:  How does that come under hindrance?

21     Hindrance is to prevent something from happening.

22          MR. KLEINHENDLER:  Right.

23          THE COURT:  It happened.

24          MR. KLEINHENDLER:  It happened.  But by doing this,

25     they are basically intimidating the state to take steps so that

L6AGjobC

1     they shouldn't have such a law in place and that affects the

2     right of voters in Georgia to have their voice heard in an

3     election that has integrity.

4                THE COURT:  Again, you have gotten so far afield from

5     your client's interests.  That's an argument that says the law

6     is good, and if they get their way, there are going to be

7     elections that are lawless in Georgia.

8                MR. KLEINHENDLER:  There are going to be elections

9     that will not have as much security and integrity as the law

10    currently provides.

11               THE COURT:  How is that at all relevant to this case?

12               MR. KLEINHENDLER:  Because that --

13               THE COURT:  Your argument is that JCN was harmed.

14               MR. KLEINHENDLER:  JCN's members are harmed.  The

15    people of Georgia are harmed if the election laws that they are

16    subject to do not provide and do not enable them to have one

17    vote counted properly because it's diluted by other votes by

18    people who don't show, for example, voter ID.  That is a harm

19    to JCN.  This case is not JCN, it's the members.  The members

20    are from the Georgia.

21               THE COURT:  It would only be a diluted vote if the

22    person without a voter ID was also not a qualified voter.

23               MR. KLEINHENDLER:  Correct.  But your Honor, I think

24    the point here is, what Major League Baseball said to the State

25    of Georgia is, we don't like your law, and we're going to

L6AGjobC

1    punish you.  How are we punishing you?  We're taking a

2    $100 million economic benefit and we're going to give it to

3    another state.  Why?  Because we like their law or their law

4    doesn't offend us.  If you are a public actor, you can't do

5    that.

6              THE COURT:  You agree that if I disagree with you or

7    at least I find that there's not a high likelihood you're going

8    to succeed on that argument, that they can do as they please,

9    if I reject your state actor argument?

10             MR. KLEINHENDLER:  If you reject my state actor

11   argument and you reject the argument that, even as a nonstate

12   actor they have intimidated the state, which is then going to

13   violate its inhabitants' equal protection, because the state

14   will be now intimidated and forced to take action to change its

15   law or do other things to accommodate Major League Baseball's

16   perceived notion of what's fair in election integrity --

17   because that's the other part -- you don't have to be a state

18   actor for that.

19             THE COURT:  What factual evidence have you put before

20   me that Major League Baseball moving out of Georgia is likely

21   to cause the Georgia legislature to do anything?  Let alone to

22   deprive your members of their right to equal protection of the

23   law.

24             MR. KLEINHENDLER:  Your Honor, this act doesn't

25   require the actual harm to happen.  The threat of it is

L6AGjobC

1    sufficient.

2              THE COURT:  But they're not threatening anybody.  They

3    just moved the game.

4              MR. KLEINHENDLER:  But moving the game was a

5    punishment.  They punished us.  So if you're punished and you

6    want to get out of that situation, you have to change your

7    behavior.  They punished us, right.  Isn't that what they did?

8              THE COURT:  I get what you're saying, but I can't say

9    that just based on the fact that they moved the game that that

10   in fact hindered or that it was their intent to hinder the

11   state legislature in passing whatever law they thought was

12   appropriate.

13             MR. KLEINHENDLER:  Your Honor, why else would they

14   move the game?

15             THE COURT:  Because they didn't like what they did.

16             MR. KLEINHENDLER:  When you're a --

17             THE COURT:  I have told you, assume they are not a

18   state actor.

19             MR. KLEINHENDLER:  If they're not a state actor, what

20   they did was still intimidation.  Whether the intimidation is

21   going to work at the end of the day, you're right, we don't

22   know.  But the fact that the result of what they did is an

23   intimidation --

24             THE COURT:  That's what I thought your theory was.

25             MR. KLEINHENDLER:  That's correct.

L6AGjobC

1          THE COURT:  That the result of their action was

2     intimidation?

3          MR. KLEINHENDLER:  Yes.

4          THE COURT:  That says your argument is that the

5     Georgia legislature is going to react to their action by

6     changing the law.  So my question is:  What are the factual

7     allegations you have given me that would allow me to draw that

8     inference?

9          MR. KLEINHENDLER:  Your Honor, you can assume that

10    because Georgia is interested in having a robust economy and

11    having robust business, and if an institution like Major League

12    Baseball is going to label Georgia a racist Jim Crow -- which

13    is what the president called it -- a racist Jim Crow state with

14    racist laws and its businesses are allowed to get harmed as a

15    result of this to the tune of $100 million, I would argue to

16    you, your Honor, that's enough of a constitutional violation.

17    I don't need to prove to you that the State of Georgia is

18    actually going to react to it.  We don't know.  It could be

19    different governors, different people.  The fact that they

20    threatened it and they did that through a punitive action

21    directed only at Georgia is in itself a violation of the

22    Constitution.  That's our position.

23          THE COURT:  Because it hinders the state legislature?

24          MR. KLEINHENDLER:  It hinders the state's ability to

25    effectively protect its citizens through passing proper

L6AGjobC

1   election integrity laws because they have been threatened

2   because they just did law A.  So they have been threatened.

3   You can't do that.  You can't threaten people with punitive

4   action.  And it doesn't really matter what their intent was.

5        THE COURT:  Wait a minute, you can't possibly really

6   think that.  That's just not true.  I mean, if a bill is being

7   considered, a business can say, if you pass that law that is so

8   contrary to our core values that we cannot bring our

9   headquarters there, we simply cannot do it; you're saying that

10  can't be done?

11       MR. KLEINHENDLER:  No, that can be done.  That's fine.

12       THE COURT:  Then what's the difference?

13       MR. KLEINHENDLER:  The difference is, we promised you

14  a game --

15       THE COURT:  No, no, no.

16       MR. KLEINHENDLER:  We punished you.  This is not a

17  punishment.  This is a decision saying, you know what, we're

18  not going to come to your state.

19       THE COURT:  Let's say they have all but signed the

20  deal to relocate headquarters with thousands of employees, with

21  lots of roads that have already been built to get the

22  industrial park ready for the new manufacturing plant, and the

23  president of that company says, you pass this law, we can't

24  deal with that.  It is contrary to our values, we will not

25  move.  You're saying they can't do that because the state is

L6AGjobC

1  already expecting them?

2          MR. KLEINHENDLER:  No, that's different.  No.  That's

3  not the state is already expecting them.  Your Honor, this is

4  two years, we're going to bring the game here.

5          THE COURT:  It's the same thing.

6          MR. KLEINHENDLER:  How is it the same thing?  I'm --

7          THE COURT:  There's not a contract with the State of

8  Georgia.  If they had a contract with Cobb County stadium, I

9  assume they paid whatever cancellation fee they had to pay.

10          In my example, trust me, small businesses would have

11  geared up, they would be ready for it, they would have hired

12  employees because we want to be there, we want to be close by

13  so that we can be the first coffee shop.

14          MR. KLEINHENDLER:  Then, your Honor, in that

15  situation, if these businesses said -- not that if you're going

16  to pass, because you're allowed to lobby -- but since you

17  passed this law, you actually engaged in the law that you

18  passed, you passed a law, we're pulling out now and we're going

19  to punish you because we don't like the law you passed, yes,

20  that would be a violation.

21          THE COURT:  What more do you want to tell me?

22          MR. KLEINHENDLER:  I want to tell you about the state

23  law violations.  And again, it goes back to what we started at.

24  We started at the argument that when they announced the game

25  was going to Cobb County in 2019, it wasn't qualified.

L6AGjobC

1          THE COURT:  It wasn't what?

2          MR. HARDIMAN:  It wasn't a qualified announcement.  It

3   was not a conditional announcement.  They promised people,

4   people relied on that promise, and they took steps based on

5   that promise.  There's a promissory estoppel claim here.

6          THE COURT:  I don't think you brought a promissory

7   estoppel claim.

8          MR. KLEINHENDLER:  I did.

9          THE COURT:  You brought a tortious interference with

10  contract claim and a tortious interference with business

11  relations claim.

12         MR. KLEINHENDLER:  Keep going.

13         MR. KLEINHENDLER:  My fifth claim for relief,

14  Paragraph 77.

15         THE COURT:  All right.

16         MR. KLEINHENDLER:  They promised people like

17  Mr. Florence they were going to bring the game here.  He spent

18  a lot of money trying to get the game ready.

19         THE COURT:  He spent a lot of money --

20         MR. KLEINHENDLER:  Trying to get the championship

21  ready, just giving him as an example.

22         THE COURT:  That he does every year?  He sponsors that

23  game every year?

24         MR. KLEINHENDLER:  He sponsors the game every year.

25         THE COURT:  So it's the same expenditure he's always

L6AGjobC

1   made?

2           MR. KLEINHENDLER:  But he lost 40 teams because of

3   what Major League Baseball did by breaking their promise.

4           THE COURT:  Maybe it was because those 40 teams were

5   also annoyed at the law.

6           MR. KLEINHENDLER:  No.  That is not what he says.  He

7   said they stopped coming because there was no reason to come to

8   Atlanta.

9           THE COURT:  Does he give the basis for why he thinks

10  that?

11          MR. KLEINHENDLER:  They told him that.  They said,

12  we're not coming to Atlanta if there's no game.  Here it is,

13  paragraph 11, there was no longer a compelling reason for them

14  to come to Atlanta to participate in the 2021 WSC because the

15  All Star Game was no longer taking place.

16          THE COURT:  What affidavit, again?

17          MR. KLEINHENDLER:  This is the Florence affidavit,

18  declaration, Paragraph 11.

19          THE COURT:  But that has the same problem.  I don't

20  know if that's what Mr. Florence thinks, that that's his

21  opinion, that they weren't coming because the All Star Game

22  wasn't there anymore or whether someone told him that.  The

23  affidavit is silent.

24          MR. KLEINHENDLER:  Your Honor, we could correct that.

25  The reason is, that's what they told him.

L6AGjobC

1        THE COURT:  Do you know that in fact or are you just

2   making it up?

3        MR. KLEINHENDLER:  No, I spoke to him, we spoke.

4        THE COURT:  Who told him that?  You don't know?

5        MR. KLEINHENDLER:  I can't give you that detail.  But

6   the point is, there was a promise made to all of these --

7        THE COURT:  Individually?  Like there was one to every

8   single business that --

9        MR. KLEINHENDLER:  No, there was one promise made and

10  everybody relied on that promise.  And then they canceled it.

11       THE COURT:  I got that.

12       MR. KLEINHENDLER:  And there's a way to fix it.

13       THE COURT:  Well, according to your client, the way to

14  fix it is a $100 million pool of money to recompense the

15  businesses.

16       MR. KLEINHENDLER:  That's if the game can't come back.

17       THE COURT:  But that means money damages are adequate?

18       MR. KLEINHENDLER:  No.

19       THE COURT:  Well, why not?

20       MR. KLEINHENDLER:  Because --

21       THE COURT:  Your client said, the CEO of the plaintiff

22  said he doesn't care if the game comes back.  The option of

23  $100 million is just ducky.

24       MR. KLEINHENDLER:  Your Honor, I think the main point

25  there is that we want the game back.  Because by bringing the

L6AGjobC

```
1    game back, we no longer have to make any assumptions about what

2    the damages are.  If you bring the game back, everybody is made

3    whole.  Whereas, if you don't bring the game back, then okay,

4    this is what the chamber of commerce estimated, everybody has

5    to come in and put their damage claims in.

6              THE COURT:  Yes, you have to prove damages.

7              MR. KLEINHENDLER:  Okay.  But we have a much easier

8    solution, bring the game back.

9              THE COURT:  Do you agree that because this would be a

10   mandatory injunction, you have to hit the higher standard?

11             MR. KLEINHENDLER:  No.

12             THE COURT:  Why not?

13             MR. KLEINHENDLER:  And we briefed that.

14             THE COURT:  But you ignored one of the two legs of

15   that standard.  That standard has two legs.  It's either if

16   you're changing the status quo or if you are providing the

17   plaintiff with substantially all of the remedy that they want

18   and that it can't be reversed if the defendant wins.

19             MR. KLEINHENDLER:  Your Honor, we're citing *Asa v.*

20   *Pictometry Intern*.  When a party tramples on someone else's

21   rights, bringing back to the status quo before that is not a

22   mandatory injunction.  It's called a prohibitory injunction.

23             THE COURT:  But none of the cases that you cited

24   involve circumstances where you're providing the plaintiff with

25   all of the remedy that they want and you can't undo it.  So
```

L6AGjobC

1    some of your cases were, for instance, children who get

2    suspended from school, so they get reinstated to school.  But

3    if the defendant ultimately wins, they serve their suspension

4    later; right?  I mean, those cases are just different.

5              MR. KLEINHENDLER:  Well, even if you do have the

6    higher standard, all you need to show on the higher standard is

7    a likelihood of success on the merits instead of a reasonable

8    chance of succeeding on the merits.  We think we have shown

9    that.

10             THE COURT:  No.  You is to show clear or substantial

11   likelihood of success on the merits.

12             MR. KLEINHENDLER:  Substantial likelihood of success

13   on the merits.  And I just get back to it, your Honor.  If they

14   are a public actor -- let's just get back to that for a

15   second -- if they're a public actor and they decided to treat

16   Georgia differently than Colorado, they violated the privilege

17   and immunities clause, black and white.  And this isn't about

18   what their intention was.  It's irrelevant.  They could have

19   had the best intentions in the world.  It doesn't matter.

20   Because their reason is not a valid reason.

21             THE COURT:  According to you?  Do you just think that

22   reasonable minds can't differ on whether a law is net positive

23   or net negative?  That's just not subject to dispute?

24             MR. KLEINHENDLER:  No.  I don't say that.  What I'm

25   saying is, you cannot pass judgment on a state's invocation of

L6AGjobC

1   its independent right to pass voting laws when the basis of

2   your negative view is, well, I don't like the fact that they

3   have a voter ID, when voter ID has been held by the Supreme

4   Court to be legal.

5           THE COURT:  You're picking at one piece of the law.

6           MR. KLEINHENDLER:  That was the reason.  We don't like

7   voter ID and you can't give water to people waiting on line.

8   That's not true.

9           THE COURT:  You keep wanting to argue the merits.

10  This case is not about whether the Georgia law is a good law or

11  a bad law.  You think it's a good law, fine.  That's not what

12  this case is about.

13          MR. KLEINHENDLER:  What this case is about, Judge --

14          THE COURT:  Let me just say, under your theory, let's

15  say Planned Parenthood had announced two years in advance that

16  it was going to have a convention in the State of Georgia, and

17  then three weeks or three months before the convention was to

18  appear, Georgia passes a law that says abortion is illegal

19  entirely in the State of Georgia and in fact, contraception is

20  illegal, you're saying Planned Parenthood still has to go have

21  their convention, spend millions of dollars in Georgia because

22  the Georgia legislature passed a law that they think is the

23  right law?  And maybe even three quarters of the Georgians

24  think it's a good law, you're saying that organization still

25  has to have its convention in that state.

L6AGjobC

1          MR. KLEINHENDLER:  No, no.

2          THE COURT:  Okay.  So that's different?

3          MR. KLEINHENDLER:  Yes.

4          THE COURT:  They can move their convention to Colorado

5     and that would be okay?

6          MR. KLEINHENDLER:  That would not be a constitutional

7     violation, because they would have a legitimate reason.

8     Because they're in the abortion business, and the state has

9     basically put them out of the abortion business.  That would be

10    a valid reason.  You can discriminate between one person in one

11    state and one person in another state, your Honor, if you have

12    a valid reason.  The situation you just gave is a valid reason.

13    The reason they gave is not a valid reason.  We don't like your

14    voting law because it has voter ID and you can't give water to

15    people on line.

16         THE COURT:  Let's say it's not a ban on abortion, it's

17    a requirement that you have to provide certain ID, that you

18    have to have your parents come in and sign off on the abortion

19    and some other requirement, it's a restrictive abortion law.

20         MR. KLEINHENDLER:  And this is Planned Parenthood as a

21    public actor, we're saying?

22         THE COURT:  You seem to think everybody is a public

23    actor.

24         MR. KLEINHENDLER:  No.  I'm saying that Major League

25    Baseball that gets billions of dollars and that has states

L6AGjobC

1    intertwined with how every single stadium operates and they

2    have to collect taxes for the state and they have to get

3    security from the state -- when I say the state, I mean local

4    municipal governments -- and they get a federal antitrust

5    immunity, yeah, that's a state actor.  Not a private

6    organization that just is Planned Parenthood.  That's not the

7    same.

8              THE COURT:  But I thought your hindrance argument,

9    that's under your 1985(3) theory, is not --

10             MR. KLEINHENDLER:  On the hindrance --

11             THE COURT:  This is all the hindrance argument.

12   There's no equal protection here.  You still don't have a

13   group.

14             MR. KLEINHENDLER:  The hindrance argument is you are

15   preventing the state from treating its residents with equal

16   protection.  In your abortion case, by you pulling -- you're

17   pulling your convention from the state, I don't believe you're

18   hindering -- I don't believe under that -- let me put it this

19   way.  It has to do with scope.  It has to do with scope and it

20   has to do with impact.  You're right, not everything would be

21   considered a violation, even if it looks like a violation.  It

22   has to do with scope.

23             Taking the Major League All Star Game, which is a

24   national event, away from a state based on a public

25   announcement that your state's laws are racist or restrictive

L6AGjobC

1    or prohibitive, okay, is a tremendous matter in terms of scope.

2          THE COURT:  I don't understand that at all, nor do I

3    see any indications that you cite say anything about this being

4    a scope issue.  I don't even know what that means.

5          MR. KLEINHENDLER:  What it means is if there were ten

6    people blocking entrance to a ballpark, you could technically

7    argue that they were committing a hindrance of my -- sorry, a

8    polling place.  There were ten people blocking entrance to a

9    polling place.  You could conceivably argue that they were

10   basically preventing voters from carrying out their right to

11   vote.  But since there are only ten people blocking one voting

12   place, we wouldn't be arguing constitutional violations.

13         THE COURT:  I don't think you're right.  I think if

14   there were ten uniformed clansmen blocking a black polling

15   place, you would get a lawsuit under the KKK act and the

16   plaintiffs would win and they'd get an injunction.

17         MR. KLEINHENDLER:  If they were blocking the

18   minorities there, that's equal -- yes.  But what I'm saying on

19   the hindrance part --

20         THE COURT:  If they were hindering anybody who wanted

21   to get into the polling place.

22         MR. KLEINHENDLER:  That's something else.  That's a

23   different part of the statute.  The point I'm trying to make

24   here is, hindering a state from allowing -- that's what the

25   language is -- hindering a state from providing equal

L6AGjobC

1   protection to its people, and that's what Major League

2   Baseball, we argue, has done here.

3          THE COURT:  I just don't get how any of this has to do

4   with hindering Georgia from providing equal protection to its

5   citizens.  I don't understand it.  It's not encouraging Georgia

6   to discriminate against blacks or whites or poor people or rich

7   people or women or men or Hispanics or Asians.  Where is the

8   equal protection violation?

9          MR. KLEINHENDLER:  The equal protection violation

10  here, your Honor, is you are denying people in Georgia the

11  right to have an All Star Game.

12         THE COURT:  What you just said -- I wish I had

13  LiveNote up, but what you just said was that the problem with

14  hindrance was they're hindering Georgia's ability to provide

15  their citizens equal protection under the law.

16         MR. KLEINHENDLER:  Correct.

17         THE COURT:  No one in Georgia is a host to the All

18  Star Game; not black people, not white people, not men, not

19  women, not tall people, not short people.  I'm struggling to

20  understand your equal protection theory.

21         I'll tell you what, I've let you go on for a while.

22  Let me hear from baseball and the union, and then we'll come

23  back to you.

24         MR. HARDIMAN:  Your Honor, John Hardiman for baseball.

25  I don't have much to say because, frankly, you hit most of my

L6AGjobC

points, even the First Amendment, which was going to be my

surprise today.

        THE COURT:  Sorry I took your thunder.

        MR. HARDIMAN:  I understand.  It happens all the time.

        Obviously, we feel very strongly about the claims on

the merits.  We don't think these allegations will even get

past a motion to dismiss, much less the much higher standard

they would have to meet for a preliminary injunction and also

the irreparable injury claims.  Maybe the easiest way, the

simplest way to make a quick argument would be to look at

Mr. Florence.  I mean, he made a business decision that this

year he might make more money if he had his fast pitch

tournament near the All Star Game, and he's been frustrated in

that.  That frustration does not amount to an equal protection

violation, a hindrance clause, a dormant clause or a privilege

and immunities action.  It's not tortious interference because

it has to have been done intentionally to him.  It's not

tortious interference with business relations because it had to

be done maliciously to him.  It is not promissory estoppel

because there was no promise made directly to him.  And on that

point, your Honor, on promissory estoppel, plaintiffs do allege

a claim in their complaint on promissory estoppel, but in their

preliminary injunction papers, they do not make any argument

that promissory estoppel satisfies the standards for a

preliminary injunction.  They have it in a heading, but it's

L6AGjobC

1    all treated under unjust enrichment, which by the way is not

2    alleged in the complaint.

3          The only other thing I would say, your Honor, because

4    this sort of goes to what you -- and also, by the way, on

5    Mr. Florence, we could pay him money to satisfy his damages.

6          You started by talking about what was the mission of

7    JCN, and they were talking about their additional funding that

8    they may have to make.  I wanted to point you to something else

9    in Mr. Ortiz's affidavit, which is what he said their future

10   expenses will be, they will continue a national education

11   campaign to dispel political activist lies about the Georgia

12   voting law.  So what he's apparently going to do is still fight

13   about the voting law.  And the controversy about that is not

14   going to end no matter where the All Star Game is.

15         Your Honor, that's all I have, unless you have some

16   questions for me.

17         THE COURT:  I don't think so.

18         MR. HARDIMAN:   Thank you.

19         THE COURT:  I have one question, sorry.  I'm sure it's

20   in your papers, but what was the articulated basis for Major

21   League Baseball moving the game?

22         MR. HARDIMAN:  I'll read you the reports.  "I have

23   decided that "-- this is the commissioner, there's a press

24   release we cited in the second and third page of our brief --

25   "I have decided that the best way to demonstrate our values as

L6AGjobC

1    a sport is by relocating this year's game and Major League

2    Baseball draft.  Major League Baseball fundamentally supports

3    voting rights for all Americans and opposes restrictions to the

4    ballot box."  It then goes on and talks about some other things

5    it's done to support those.  So that's the reasons.

6            So since you asked me the question, I get to make my

7    point, I think the only constitutional issue here is if you

8    were to enjoin baseball, give the injunction plaintiffs want

9    for taking that position, I do think that raises a First

10   Amendment issue.  That's all I've got.

11           THE COURT:  What about the union?

12           MR. KESSLER:  Your Honor, I'm going to be very short.

13   My client rarely agrees with Major League Baseball, on this

14   we're in agreement.  My point, your Honor, we don't belong

15   here.  You've listened to this argument for an hour.  Did you

16   hear the union mentioned even once?

17           THE COURT:  I think you are a conspirator.  I think

18   you are only in the 1985(3) claim as a conspirator.

19           MR. KESSLER:  Well, I'm listed in all these other

20   claims as well.  I'm listed in the state tort claims.  I'm

21   listed in -- but you're right I'm only one of the two 1985

22   claims, only the 1985 claim on the KKK act.

23           The point here, your Honor, is that they admit that we

24   don't have the power.  We didn't make the decision.  It's right

25   in their papers.  They never directed anything at us.  And they

L6AGjobC

do have a duty on an injunction to have evidence.  And if

they're going to say we're in a conspiracy, they have to show

an agreement.  There are no facts of an agreement alleged here.

They allege four pieces of evidence.  This is all they

allege here -- not all evidence, but I'll give them the benefit

of the doubt -- one, they cite a public statement by Mr. Clark

that he has not yet spoken to Major League Baseball, the

opposite of an agreement.

Number two, they cite the public statement of Major

League Baseball announcing they have canceled the game, which

simply says they have consulted with many people; retired

players, constituencies, the union, they have listened to

everyone's views and said they made the decision.  It actually

says, I made the decision, the commissioner.  Nothing about any

agreement.

Then they cite a news article that says they heard

unidentified players -- not the union, not Mr. Clark --

unidentified players were threatening to boycott the game, has

nothing to do with the union.  And the same article, the same

article says the decision was made by Major League Baseball on

its own entirely.

The last piece of so-called evidence they have is they

say that the chairwoman of Cobb County made a public plea to

please give back the game, and the union didn't do anything.

Well, the union doesn't have any power to do anything, as they

L6AGjobC

said.  And they actually say in their brief -- this is their

reply brief, Page 8 -- they agree, "The MLBPA lacks the power

to return the game to Atlanta."  So what was my client supposed

to do?

          Your Honor, this is a fatal defect to every claim.

And particularly under the heightened standard.  I want to add,

your Honor, they actually fail both prongs.  Your Honor is

right, they fail the complete relief that can't be fixed

unquestionably.  The reason they fail mandatory injunction is

because they sat on their rights for two months.  And what the

case law says is when you sit on your rights, a new status quo

happens.  The new status quo is the game is in Denver.

Everyone is relying on that; people in Denver are relying on

it, businesses, stadiums, that's the status quo.  So this is

still a mandatory injunction.

          The last point I have, your Honor, is that they do say

intent is relevant and they publicly besmirch my client saying

we have a racist intent.  And the reason they said that is

because the KKK act requires that you have an invidious racist

intent as part of the conspiracy.  That's wrong.  There's no

possible basis for it.  And I'm making this point now your

Honor, because it's not only to defend my client, but we think

this is a sanctionable abuse of process to just say that when

we have nothing to do with the decision and certainly we're a

union who is dedicated to our diverse membership.  To make that

L6AGjobC

1   claim, it's wrong.  And we may be back to your Honor on that

2   subject on a later day.

3          Finally, Mr. Clark, they made no allegation that's

4   separate from him being the executive director.  He doesn't

5   belong here either.  That's it for me, your Honor, unless you

6   have something else.

7          THE COURT:  That's fine.  Was he sued as an

8   individual?  I guess he was.

9          Mr. Kleinhendler?

10          MR. KLEINHENDLER:  Your Honor, I'd like to get back to

11   some of your questions.

12          THE COURT:  Okay.

13          MR. KLEINHENDLER:  With regard to the deprivation

14   clause, we didn't talk about that.  So the 1985(3) has two

15   prongs; the hindrance clause and the deprivation clause.  And

16   on the deprivation clause, we cite *Metro Life Insurance* -- you

17   asked me for some of my better cases -- it's a 1985 Supreme

18   Court case.  What Major League Baseball did here is they are

19   punishing Georgia residents and businesses with the aim of

20   forcing Georgia to change the law.  Now, I know your point is,

21   well, do we have evidence that Georgia will in fact change the

22   law?  I understand that.  But I argue to you that the mere --

23   threatened and harassment is in itself a violation of the

24   deprivation clause.

25          THE COURT:  Where is this in your brief?

L6AGjobC

1          MR. KLEINHENDLER:  Page 11, your Honor.  It's on Page

2     11 of the moving brief.

3          THE COURT:  Go ahead.

4          MR. KLEINHENDLER:  Second, your Honor, you asked me

5     what was the equal protection violation here.  And the equal

6     protection violation, your Honor, is even though it's a large

7     class, it's preventing the people of Atlanta from enjoying

8     economic benefits merely because their state has enacted a

9     certain law that is anathema to the person that has deprived

10     them of the economic benefits.  And what happens, your Honor,

11     is if we don't have a valid integrity law, that impact to equal

12     protection rights of every citizen who votes and that was what

13     I was --

14          THE COURT:  How?

15          MR. KLEINHENDLER:  Because it basically turns into,

16     your Honor, a preclearance statute.  And the Supreme Court

17     showed --

18          THE COURT:  Wait a minute.  Say that again.

19          MR. KLEINHENDLER:  The court in *Shelby* -- which is a

20     Supreme Court case --

21          THE COURT:  Yes.

22          MR. KLEINHENDLER:  -- said that Congress cannot force,

23     Congress cannot force a state to --

24          THE COURT:  To preclear their election laws.

25          MR. KLEINHENDLER:  Preclear their election.  What

L6AGjobC

1    major League Baseball -- if they are a state actor -- what they

2    are doing here is, unless we like your election law, we're

3    going to hurt you by taking away economic benefits that we have

4    promised to you, okay.  We're going to hurt you by taking that

5    away from you.  And that makes this unique to the voting law

6    issue here and somehow distinguishes some of the other examples

7    you were giving --

8            THE COURT:  That's nowhere in your briefs.

9            MR. KLEINHENDLER:  Sure it is.  We cite *Shelby*.

10           THE COURT:  No.

11           MR. KLEINHENDLER:  It is sure.

12           THE COURT:  That you are arguing that Major League

13   Baseball has essentially stepped into the role of the

14   Department of Justice and is imposing preclearance on Georgia

15   legislature?

16           MR. KLEINHENDLER:  Yes, your Honor.  Sure.

17           THE COURT:  Well, I certainly did not understand that

18   to be your argument.

19           MR. KLEINHENDLER:  Your Honor, Page 12 of the brief,

20   I'll read it to you.  "For defendants to punish Georgia for

21   taking these reasonable measures, measures with Georgia's

22   sovereign right in our federal system, is to claim for

23   themselves the right to preclear Georgia's election law in a

24   way that Supreme Court has held to violate equal protection

25   principles when Congress itself takes that action."  *Shelby*,

L6AGjobC

1    Page 12 of our moving brief.

2              With regard to the comments from Mr. Clark --

3              THE COURT:  From Mr. Clark?

4              MR. KLEINHENDLER:  I'm sorry, counsel for Mr. Clark.

5    The reason the union and Mr. Clark have been sued is because

6    it's clear that Mr. Manfred and Mr. Clark communicated about

7    moving the game out of Atlanta.  It's clear and we have other

8    basis for that that's not simply in the public statements.

9              THE COURT:  But just communicating isn't an agreement.

10             MR. KLEINHENDLER:  Well, no, we are saying they

11   communicated and agreed, we have evidence -- we have very, very

12   good reason to allege that they were in communications with

13   others together on telephone calls -- Clark and Manfred and

14   others -- and together they decided that we're going to react

15   to the voting law by moving the All Star Game.  Mr. Clark

16   himself participated.

17             THE COURT:  Where is that in the complaint?

18             MR. KLEINHENDLER:  Your Honor, we say in the complaint

19   that they met and spoke and agreed.  At this stage --

20             THE COURT:  I think you say met and spoke, but maybe

21   you said agreed.  It was thin on facts.

22             MR. KLEINHENDLER:  Well, your Honor, on conspiracy,

23   you don't usually have all the facts.

24             THE COURT:  But you need to have some.

25             MR. KLEINHENDLER:  Yes.

L6AGjobC

1          THE COURT:  You might not have all of them, but you

2     need some.

3          MR. KLEINHENDLER:  The facts are borne out by -- the

4     public statements certainly give an inference to the fact.

5     These aren't facts coming out of nowhere.  They're even

6     corroborated by the public statements of some of the parties.

7          THE COURT:  You're talking in broad generalities.

8     Look, you are the plaintiff.  You have to have a well pled

9     complaint that has facts.  They may not have all the facts, but

10    they have to have some facts.

11         MR. KLEINHENDLER:  The facts, your Honor, are in the

12    complaint.

13         THE COURT:  That's what I was asking you.  Where is

14    your allegation about Mr. Clark?

15         Paragraph 32 says "players are aware of the Georgia

16    law and we have not talked to Major League Baseball, but we

17    would like to talk too Major League Baseball."

18         MR. KLEINHENDLER:  Paragraph 34, your Honor, "Between

19    March 26th and April 1st, defendants Manfred and Clark

20    discussed the Georgia act and the plan to punish Atlanta-based

21    businesses, including JCN's members by moving the All Star

22    Game."

23         THE COURT:  It doesn't say there's an agreement.

24         MR. KLEINHENDLER:  Keep going.  "On Friday, after

25    agreement was reached among defendants --"

L6AGjobC

1          THE COURT:  But you don't say that Mr. Clark was part

2     of that.

3          MR. KLEINHENDLER:  There are no other --

4          THE COURT:  The general allegation.

5          MR. KLEINHENDLER:  There are no other defendants.

6     There are only two.  There's Manfred and Clark.

7          THE COURT:  How about Major League Baseball and the

8     union?

9          MR. KLEINHENDLER:  Major League Baseball functions

10    through Mr. Manfred, so he's acting on their behalf.  We're not

11    alleging separate conspiracies.

12          THE COURT:  For that allegation, it could be the

13    agreement between Manfred and baseball, between Manfred and the

14    other team owners.  It's very unclear.  Look, your complaint is

15    not well pled in this regard.  I think that's Mr. Kessler's

16    only point.

17          MR. KLEINHENDLER:  With regard to -- he's saying he

18    has no basis upon which to participate in the decision to move

19    the game, I would refer you to the Major League Baseball

20    constitution and Article 3, Section 6F says specifically that

21    mandatory All Star Game participation, "All clubs have to

22    provide the necessary services of players."  So within the

23    baseball's constitution, there is an obligation on the players

24    who are represented by the union to participate in the All Star

25    Game where it is played.

L6AGjobC

1          THE COURT:  Right, to show up and play.

2          MR. KLEINHENDLER:  That's why we included them in the

3     injunction.

4          THE COURT:  You named them as a defendant.  I think

5     Mr. Kessler's point is, you named them as a defendant.  You

6     didn't just say they're along for the ride.

7          MR. KLEINHENDLER:  We named them as a defendant

8     because they were in the conspiracy.

9          THE COURT:  And his point is you don't have well pled

10    allegations showing that they agreed to anything.

11         MR. KLEINHENDLER:  That's his position, okay.  But

12    there's a reason why we included them.  If I needed to amend

13    that, I could be more specific.  But there's a reason they're

14    included.  And they're necessary for the injunction, your

15    Honor, because they have to cooperate.  So if you ordered Major

16    League Baseball move the game back to Atlanta, they have to

17    cooperate with that and say, okay, we're going to play.

18         THE COURT:  Well, they're obligated under --

19         MR. KLEINHENDLER:  But that's why they are a necessary

20    party here because we need them to agree to play in the game

21    and not say, well, you know something, Major League Baseball,

22    you may want to bring the game back, but we're not going to

23    play.  And so that's the reason we named them.  There was a

24    reason to name them.  It wasn't for nothing.  So his points are

25    just simply incorrect, that he has nothing to do with it.  It's

L6AGjobC

1    just not correct.

2             So the point here, your Honor, is at the end of the

3    day, I think the perception you have of Major League Baseball

4    being allowed to have a First Amendment right or being allowed

5    to have some type of opinion on a statute, okay, is not

6    consistent with the congressional requirements that to impose a

7    harm -- to impose a harm, which is pulling the All Star Game,

8    which is a harm, okay -- maybe we haven't quired it correctly,

9    maybe we haven't identified every single person that is harmed,

10   but it is a harm, and at least one person has demonstrated his

11   harm.  If you are going to harm someone, you need to have a

12   valid reason.  And if your reason for harming them is because

13   you have a problem with the voting laws of a certain state, you

14   call into question the various statutes that we have identified

15   to you.  Because by doing that, you are effectively punishing

16   the state for enacting a law of election integrity and that in

17   turn affects how the people in the state can vote, which is an

18   equal protection issue.

19            So getting back to where is the equal protection

20   violation?  That's where the equal protection -- the right to

21   have your vote counted properly and effectively, because the

22   laws in your state guarantee election security, that's your

23   equal protection.

24            Where is your privilege of immunities?  That's the

25   simple theater analogy.  You, Major League Baseball, you cannot

L6AGjobC

1    treat Atlanta or Georgia -- you can't treat people different

2    from different states differently.  You just can't do that.  So

3    you can't say yes to Colorado, no to Georgia because we don't

4    like your voting law.  It's not a legitimate reason.  Now, you

5    may think -- you may disagree with me on that.  I get it.  But

6    if you agree that it's not a legitimate reason because Georgia

7    has its own right to make its laws and saying that I don't like

8    the law because voter ID inhibits people from voting, that's

9    not a valid reason, because the Supreme Court said it's fine.

10   And by the way --

11        THE COURT:  No, the Supreme Court says it's not

12   unconstitutional.  The Supreme Court doesn't sate it's good

13   policy.  There's a difference between something being

14   permissible as a matter of constitutional or statutory law and

15   it being good policy.  And a lot of what goes on in the

16   marketplace of ideas and in arguments and people taking stands

17   is not that they're saying what you're going to do is unlawful.

18   It is to say, you may be able to do that, but we think that's

19   bad policy.  We think that restricts the franchise.  We think

20   that impinges on a woman's ability to choose what she's going

21   to do with her own body, whatever it is that people are arguing

22   about.  The fact that what they did was legal and may pass

23   constitutional muster if it's challenged in the State of

24   Georgia is an entirely different question than whether

25   businesses can say, we don't like this, we think this is not

L6AGjobC

1    the right -- from a policy perspective -- we don't think this

2    is the right way to go.  We don't want to participate in this.

3    We don't want to spend the entire All Star weekend having our

4    players, our manages, our owners being asked, why are you

5    playing this game in Georgia when they just passed this law

6    that has all of these alleged negative effects.  Maybe it does,

7    maybe it doesn't.  But that's a policy debate that maybe Major

8    League Baseball just doesn't want to have.  It just wants to

9    say, look, we don't think this was the right law, so we don't

10    want to be there.  We're going to go elsewhere.

11         MR. KLEINHENDLER:  If they're a state actor, they

12    don't have that luxury.

13         THE COURT:  Assume that you're going to lose that

14    argument.

15         MR. KLEINHENDLER:  If they're a private actor, your

16    Honor, if the result of that is to threaten the state

17    legislature because look what's going to happen to you,

18    Mr. State Legislature, when you do something that we, Major

19    League Baseball doesn't like, your Honor, that's a violation of

20    the hindrance clause, because it prevents the state from

21    treating its citizens under equal protection of the law by

22    enacting what it perceives to be safe election policy and laws.

23         THE COURT:  I think you agreed with me earlier that a

24    company could announce that if a state takes a certain

25    legislative action that they are not going to move to the

L6AGjobC

```
 1   state, that that is permissible.  That's something that would
 2   hinder and interfere because it takes place before the
 3   legislature acts.  So they know if they take that action,
 4   however good a policy that you think it is, that they may have
 5   an adverse impact on their citizenry.  I don't think you're
 6   right, because I think the company has a First Amendment right
 7   to say, we disagree with this and we disagree with it so
 8   viscerally, we think it's such bad policy, that if you do that,
 9   we are not going to locate our headquarters there.  That could
10   easily interfere, particularly if you are a small state.
11   Georgia is not.  But if you are a small state, the tax dollars
12   that would be coming in from this particular company would be
13   extremely valuable to the state.  It could influence the
14   legislature.  But Major League Baseball -- the Georgia
15   legislature has acted.  You have not a single allegation that
16   suggests that they are cowed or intimidated by the actions of
17   Major League Baseball.  And by the way, they do still have the
18   Braves.
19          MR. KLEINHENDLER:  Yes, they do have the Braves, your
20   Honor.
21          But my point to that is I don't need at this point to
22   show you that it's actually going to happen.  The threat of
23   intimidation alone is the violation.
24          THE COURT:  But you do have to show that there's a
25   substantial likelihood that I'm going to find Major League
```

L6AGjobC

1    Baseball moving a single game somehow has a significant

2    likelihood of intimidating the Georgia legislature that has

3    already acted.

4              MR. KLEINHENDLER:  Your Honor, what you have to

5    find -- let's just get it really sharp -- if you find a

6    constitutional violation, you have assumed irreparable injury.

7    If you have a likelihood of success on a constitutional

8    violation, you have assumed irreparable injury, I have met the

9    standards --

10             THE COURT:  If I assume everything that you argue, of

11   course you win.

12             MR. KLEINHENDLER:  I'm not saying you should assume

13   anything.  I'm saying that all you need to find as a matter of

14   law because the facts are not in dispute -- really not in

15   dispute -- all you need to find as a matter of law is that the

16   threat to the Georgia legislature, which was carried out

17   through a punitive action, is in itself a violation of the

18   hindrance clause and 1985(3).

19             Now, I don't believe you need to reach the conclusion

20   or need to have an overwhelming likelihood of success that

21   Georgia legislature will in fact act based on this

22   intimidation.  All we need to show is that there was an

23   intimidation, the intimidation was based on duly elected voting

24   law, and that the purpose of it was to punish Georgia,

25   punish --

L6AGjobC

1          THE COURT:  Who was intimidated?  You just said all

2     you have to do is show intimidation.  So who was intimidated?

3          MR. KLEINHENDLER:  The people of Georgia were

4     intimidated because --

5          THE COURT:  How so?

6          MR. KLEINHENDLER:  Because they lost -- they were

7     publicly --

8          THE COURT:  That's circular.  How were they

9     intimidated?

10          MR. KLEINHENDLER:  They were punished.

11          THE COURT:  That's not intimidation.

12          MR. KLEINHENDLER:  Yes, it is.  I'm punishing you --

13          THE COURT:  You laid out the standard.  You said, I

14     have to show intimidation.  You have to show intimidation?

15          MR. KLEINHENDLER:  Yup.

16          THE COURT:  Right.  So who was intimidated?  All of

17     the people of Georgia were intimidated, you're saying?  People

18     who favored the law, people who disfavored the law, people were

19     agnostic to the law?

20          MR. KLEINHENDLER:  No.  They were intimidating the

21     Georgia legislature by taking this punitive action based on

22     conduct that the Georgia legislature enacted.

23          THE COURT:  Anything further?

24          MR. KLEINHENDLER:  No, your Honor.

25          THE COURT:  Last chance for baseball.  Last chance for

L6AGjobC

1    the union.

2          MR. KESSLER:  Just one thing, your Honor.  Not only

3    does he not plead an agreement -- and we'll do that on the

4    motion to dismiss -- but since it's a preliminary injunction

5    and he has to have evidence, there's no evidence.  That's it,

6    your Honor, for me.

7          THE COURT:  Let's take a five-minute break.

8          (Recess)

9          THE COURT:  I am prepared to rule on plaintiff's

10   motion for preliminary injunction.

11         The motion is denied.  The plaintiff lacks standing to

12   seek injunctive relief and has failed to demonstrate that it is

13   likely to suffer irreparable harm in the absence of an

14   injunction.

15         Before the Court can even reach the merits of

16   plaintiff's motion for preliminary injunction, it must be

17   satisfied that the plaintiff has standing, *City of Los Angeles*

18   *v. Lyons,* 461 US 95, 101 (1983), "Those who seek to invoke the

19   jurisdiction of the federal courts must satisfy the threshold

20   requirement imposed by Article III of the constitution when

21   alleging an actual case or controversy."  To satisfy Article

22   III's standing requirements, the plaintiff must show that it

23   has suffered an "injury in fact" that is not only concrete and

24   particularized but actual and imminent, rather than conjectural

25   or hypothetical, *Lujan v. Defenders of Wildlife,* 504 US 555,

L6AGjobC

560 to 61 (1992).  The plaintiff must also show that the injury

is fairly traceable to the challenged action of the defendant

and that it is likely, as opposed to merely speculative, that

the injury will be redressed by a favorable decision, Id.

An organization may establish standing on behalf of

itself by demonstrating these same three requirements; injury

in fact, traceability and redressability, *New York Civil

Liberties Union v. New York Transit Authority,* 684 F.3d 286,

294, Second Circuit 2012.  Alternatively, an organization may

demonstrate a standing on behalf of its members by

demonstrating that:  One, its members would have standing to

sue in their own right; two, the interest it seeks to protect

are germane to the organization's purpose; and three, neither

the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit, *Hunt v.

Washington State Apple Advertising Commission,* 432 US 333, 343

(1977).

A plaintiff must demonstrate standing for each claim

and for each form of relief sought, *Cacchillo v. Insmed, Inc*,

638 F.3d 401, 404, Second Circuit 2011.  To have standing to

seek injunctive relief, the plaintiff must establish that it

has sustained or is immediately in danger of sustaining some

direct injury as a result of the defendant's challenged

conduct, *Lyons* 461 US at 102.  The plaintiff cannot rely on

past injury to satisfy the injury requirement when seeking an

L6AGjobC

injunction, but must instead show a likelihood that it will be
injured in the future, Id.

Here, plaintiff fails to allege any prospective
ongoing injury to JCN itself.  Although it's very unclear from
the complaint exactly what the mission of JCN is, it appears
that its mission is to educate policymakers about policies that
help or harm small businesses, complaint Paragraph 10.
Specifically, the complaint alleges that, "When JCN members
suffer injury due to bad public policy," JCN "amplifies their
stories in the media to educate policymakers and the public
about the significant consequences of bad public policy in an
attempt to rectify it," Id.  Nowhere does the complaint allege
how Major League Baseball's decision to move the All Star Game
had or will have any direct impact on its ability to continue
to communicate the importance of small businesses to the US
economy or to amplify the impact that bad public policy has on
small businesses.

JCN asserts that Major League Baseball's decision to
move the All Star Game has "caused direct damage to JCN"
because since the cancellation announcement on April 2, 2021,
it has diverted resources and incurred expenses to protest
MLB's decision, such as leasing a sign in Times Square and
taking out an advertisement in the "New York Times," complaint
Paragraph 13.  Although it is true that diversion of an
organization's resources to respond to a defendant's alleged

L6AGjobC

1    wrongdoing can constitute an injury in fact, for it to do so,

2    the organization must divert resources from its general mission

3    or typical activities, *Havens Realty Corp. v. Coleman,* 455 US

4    363, 379 (1982), holding that plaintiff had alleged a

5    cognizable injury because defendants' racial steering practices

6    "impaired its efforts to equal access to housing through

7    counseling and referral services," and caused plaintiff to have

8    to "devote significant resources to identify and counteract"

9    the practices, *Olsen v. Stark Homes, Inc*, 459 F.3d 140, 158,

10   Second Circuit 2014.  Entity had organizational standing due to

11   its diversion of resources from its housing advocacy and

12   counseling services in order to investigate alleged

13   discriminatory practices, Center for Food Safety v. Price, No.

14   17 CV 3833, 2018 WL 4356730 at Page 5, (S.D.N.Y. September 12,

15   2018), holding that injuries that are "not sufficiently

16   distinct from the general mission of the organization" are

17   insufficient to confer standing.

18          In this case, the Court is not at all convinced that

19   plaintiff has in fact diverted resources to respond to

20   defendant's decision to relocate the game.  In fact, it appears

21   that taking out advertisements in newspapers and posting

22   billboards is precisely how plaintiff fulfills its mission.

23   For example, plaintiff's website indicates that on May 26th,

24   2021, plaintiff placed a billboard in Times Square that stated,

25   "Zero Stars for New York's Union Boss Power Grab.  Find out why

L6AGjobC

1    everyone hates New York's plan to force gig workers into

2    Unions."  On March 22, 2021, plaintiff placed a billboard in

3    Times Square that stated, "Biden wants to raise taxes on small

4    businesses?  Hell no!  Not on our watch!"  A quick perusal of

5    the advertisements page of JCN's website shows that it has paid

6    for 17 billboards and ads since January 2020.  Put differently,

7    plaintiff has failed to allege that its purported injuries --

8    which include buying an ad in the "New York Times" and posting

9    a billboard in Times Square -- are "sufficiently distinct" from

10   its overall mission to constitute an injury in fact, *Center for*

11   *Food Safety* at Page 5.

12           That being said, to the extent that plaintiff argues

13   it has suffered an injury in fact, because allocating resources

14   to protest MLB's decision is sufficiently distinct from its

15   overall organizational mission, such expenditures do not

16   constitute a cognizable injury.  It is well settled law that an

17   entity's "mere interest in a problem" absent any allegation of

18   actual injury is insufficient to confer standing, *Sierra Club*

19   *v. Morton,* 405 US 727, 739 (1972).  The court does not doubt

20   that JCN has an intense interest in where the All Star Game is

21   played.  Although it's not at all clear why it cares more about

22   small businesses in Atlanta than small businesses in Denver.

23   JCn's expenditures that are clearly designed to influence

24   public discourse concerning the wisdom *vel non* of the Georgia

25   election law are simply not the sort of expenses that can be

L6AGjobC

considered injury in fact for purposes of standing, see *Center for Food Safety* at 5, noting that an entity's decision to "spend money on particular interest to it" is insufficient to confer standing because it will "contravene the principle that an entity's mere interest in a problem cannot support standing."  The Court is unaware of any case and plaintiff has cited none in which a court has found that an organization has adequately alleged an injury in fact based on its expenditure of resources to complain publicly about the defendant's actions.

Finally, and most significantly, putting aside whether expenses associated with complaining about MLB's decision is the sort of injury that is an injury in fact for Article III purposes, past injuries, absent an allegation of their continuing, are insufficient to demonstrate standing to seek injunctive relief, *Nicosia v. Amazon.com, Inc,* 834 F.3d 220, 239, Second Circuit 2016.  "Although past injuries may provide standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [it] is likely to be harmed again in the future in a similar way."  In an apparent attempt to fill the gap that exists in its complaint regarding ongoing injury to itself, JCN has asserted in its reply papers that it intends to spend more than $10 million over the next six months on a continuing media campaign.  That's Ortiz affidavit, Docket No. 38 at Paragraph

L6AGjobC

5.   The goal of the campaign -- according to the plaintiff --
is to engage in, "A national education campaign to dispel
political activist's lies about the Georgia voting law so
additional events, businesses and conventions don't abandon
Georgia and Atlanta," Id.  First, as noted, those allegations
are not in the complaint.  Second, also is noted the Court is
not convinced that such expenditures are not precisely the type
of costs plaintiff assumes in order to fulfill its mission.
Third, it is apparent that those expenditures have nothing to
do with MLB's decision to relocate the All Star Game.  Even if
MLB were to move the game back to Atlanta, other businesses
that disagree with the policy decisions of the Georgia
legislature could continue to shun Georgia, giving rise to
JCN's perceived need to "dispel the lies" on which those
businesses choose to act.  Plaintiff appears to recognize as
much because it admits it will continue this campaign for at
least the next six months, well beyond the July 13 date of the
All Star Game.  In short, plaintiff lacks standing to pursue
relief on behalf of itself, because it has not adequately
alleged injury in fact.

        Plaintiff has also failed to show that its members
have suffered and will continue to suffer concrete injury.  At
the outset, Plaintiff's complaint fails to identify a single
one of its purported 3,600 members from the greater
metropolitan Atlanta area, complaint Paragraph 11.

L6AGjobC

1    Accordingly, the Court is entirely unable to evaluate whether

2    any actual member of JCN would "have standing to sue in its own

3    right," *Hunt*, 432 US at 343.  Plaintiff does not even allege

4    that the purported injuries about which it complains –– things

5    like canceled hotel reservations and changes to restaurant

6    menus that had been planned to honor the All Star Game were

7    suffered by any of its own members, as opposed to having been

8    suffered by random small businesses that have no connection to

9    JCN.  For example, plaintiff alleges that, "some" small

10   businesses would "suffer substantial losses if the All Star

11   Game is not immediately reinstated to Truist Park," but it does

12   not specify whether any of those businesses is a member of JCN,

13   complaint Paragraph 12.  Similarly, plaintiff alleges that, as

14   a result of the cancellation, "more than 8,000 hotel

15   reservations were canceled" and "revenues from ticket sales and

16   stadium food by the more than 41,000 expected to attend the

17   events at Truist Park were lost," but does not allege that its

18   own members suffered or will suffer any of those injuries.  Id

19   at Paragraph 41.

20          Moreover, even assuming that the injuries alleged in

21   the complaint were suffered by the members of JCN, plaintiff

22   fails to allege that those injuries were likely to recur, see

23   Paragraphs 41 and 43.  Allegations that hotel reservations were

24   canceled, rather than were lost, future events scheduled in

25   Atlanta had already been canceled, and Will Smith "has

L6AGjobC

1    canceled" the filming of his movie in Georgia.  Put

2    differently, plaintiff's conclusory allegation that the harm to

3    JCN members is ongoing, Ortiz declaration Paragraph 12, is

4    wholly unsupported by any well pled allegations in the

5    complaint.  Even the Florence affidavit, which was part of the

6    reply -- not part of the complaint -- alleged injuries in the

7    past, (e.g. he purchased in the past season tickets to the

8    Braves, teams have already dropped out of his event, his

9    opening ceremonies were canceled, his revenue has been

10   reduced.)  As noted, plaintiff cannot rely on past injuries to

11   demonstrate standing to seek injunctive relief, *Nacosia*.

12   Accordingly, plaintiff has failed to allege that it has

13   standing to pursue injunctive relief on behalf of its members.

14        Finally, plaintiff fails to establish third-party

15   standing.  To establish third-party standing, the plaintiff

16   must demonstrate:  One, it has suffered an injury in fact

17   giving it a "sufficiently concrete interest" in the outcome of

18   the issue in dispute; two, it has a "close relation" to the

19   third party; and three, there is "some hindrance to the third

20   party's ability to protect his or her own interests," *Powers v.*

21   *Ohio*, 499 US 400, 411 (1991).

22        Plaintiff alleges injuries on behalf of numerous

23   entities that are not members of JCN including, but not limited

24   to, Cobb County, Cobb County's tourism arm, the City of

25   Atlanta, multiple municipalities, the Atlanta local economy,

L6AGjobC

1    "thousands of hardworking ordinary men and women in the Atlanta

2    area," Georgians generally, and "some crew members" on a movie

3    that was being filmed in Georgia until filming was canceled.

4    See, for example, the complaint Paragraphs 1 through 4, 42

5    through 43 and 59.  Plaintiff does not even attempt to allege

6    nor could it that it has a "close relation" with any of those

7    purported third parties or that there is any hindrance to their

8    ability to protect their own interest.  Accordingly, plaintiff

9    has failed to allege adequately that it has third-party

10   standing to seek injunctive relief.

11        Having found that plaintiff has not alleged any injury

12   on behalf of itself or any ongoing injury to its members and

13   has failed to allege that it has third party standing to sue on

14   behalf of anyone who is not a member of JCN, the Court need not

15   address the causation or redressability prongs of the standing

16   analysis.

17        While some of the failures in the complaint that I

18   have just discussed might be capable of being cared through an

19   amended complaint, even if they were, JCN would not be entitled

20   to a preliminary injunction.  The preliminary injunction is an

21   "extraordinary remedy that should hot be routinely granted,"

22   *Patton v. Dole,* 806 F.2d 24, 28, Second Circuit 1986.  A party

23   seeking a preliminary injunction must show:  One, a likelihood

24   of success on the merits; two, that the party is likely to

25   suffer irreparable injury in the absence of an injunction;

L6AGjobC

1    three, that the balance of hardships tips in the party's favor;

2    and four, that an injunction is in the public interest,

3    *Capstone Logistics Holdings, Inc. v. Navarrete,* 736 F Appendix

4    25, 26, Second Circuit 2018.

5            Where, as here, the plaintiff seeks a mandatory

6    preliminary injunction that "will provide the movant with

7    substantially all of the relief sought" and that "cannot be

8    undone even if the defendant prevails on the merits," the

9    plaintiff must meet a "higher standard" of clear or substantial

10   likelihood of success on the merits, *Tom Doherty Associates,*

11   *Inc. v. Saban Entertainment, Inc.* 60 F.3d 27, 33 and 35,

12   Second Circuit 1995.  Plaintiff argues that it is not subject

13   to this higher standard because it is seeking a return to the

14   status quo before defendants took the action complained of.  In

15   so arguing, plaintiff ignores the second factor, which, if

16   present, requires plaintiff to meet the higher standard,

17   specifically whether the requested injunction "will provide the

18   movant with substantially all of the relief sought" and that

19   "cannot be undone, even if the defendant prevails at a trial on

20   the merits."  There is no question that requiring MLB to move

21   the game back to Atlanta would provide plaintiff with

22   substantially all of the relief it seeks, and it cannot be

23   undone if plaintiff loses at trial.  For that reason, the more

24   rigorous standard applies.

25           "A showing of irreparable harm is the single most

L6AGjobC

important prerequisite for the issuance of a preliminary

injunction," *Faiveley Transportation Malmo AB v. Wabtec Corp.*

559 F.3d 110, 118, Second Circuit 2009.  Irreparable harm

requires a showing that plaintiffs will suffer an "actual and

imminent" injury that cannot be remedied if the Court waits

until the end of trail to resolve the harm, *Singas Famous Pizza*

*Brands Corp. v. New York Advertising, LLC,* 468 F. Appendix 43,

45, Second Circuit 2012.  In evaluating whether the plaintiff

will suffer imminent harm, "the Court must actually consider

the injury that plaintiff will suffer if he or she loses on the

preliminary injunction, but ultimately prevails on the merits,

paying particular attention to whether the remedies available

at law, such as monetary damages, are adequate to compensate

for that injury," *Salinger v. Colting,* 607 F.3d 68, 80, Second

Circuit 2010.

        Plaintiff has failed to demonstrate that it or its

members would suffer irreparable harm absent a preliminary

injunction.  Although plaintiff equates the loss of the All

Star Game to the loss of a child's innocence, Plaintiff's brief

at 21, such hyperbole is neither persuasive, nor is it

supported by its own arguments.  In fact, plaintiff's opening

brief concedes that JCN and its members can simply seek money

damages if the All Star Game does not return to Atlanta,

plaintiff's brief at 2.  Moreover, Plaintiff's CEO, Alfredo

Ortiz, publicly stated that it was "fine" if MLB did not want

L6AGjobC

to move the game back to Atlanta, because plaintiff was also

giving it the option to instead set up a $100 million relief

fund for the businesses affected by the move, MLB opposition,

Docket No.  31 at Page 1, Note 1, citing interview 'They Did

Come Together to Punish Georgia':  Job Creators Network Sues

MLB, DAILY CALLER, (June 1, 2021 at 10:21 p.m.)  While the

Court seriously doubts that JCN's members in metro Atlanta

which it estimates number around 3,600, could have suffered

anything close to 100 million in damages by virtue of the

relocation of the All Star Game, the concession in the brief

that money damages would be adequate to rectify the alleged

wrong seriously undermines plaintiff's argument that it or its

members will suffer irreparable harm in the absence of an

injunction.

        The Court rejects plaintiff's argument that it has

established irreparable harm merely by alleging a

constitutional violation, plaintiff's brief at 21.  Plaintiff's

cited cases all involve allegations of ongoing violations of

constitutional rights that could not be remedied by money

damages, see for example *Jolly v. Coughlin,* 76 F. 3d at 482,

Second Circuit 1996.  (Injunction to release inmate from

medical keeplock conditions.)  *Bery v. City of New York,* 97

F.3d 689, 694, Second Circuit 1996, (injunction to lift

prohibition on sale of art).  *Yang v. Kellner,* 458 F.Supp. 3d

199, 209 (S.D.N.Y. 2020) ,injunction to restore candidates'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L6AGjobC

1   name to presidential primary ballot and requiring state to hold

2   primary.  *National Coalition on Black Civic Participation v.*

3   *Wohl*, 2020 WL 6305325 at Page 10 to 12 (S.D.N.Y. October 28,

4   2020), injunction to stop ongoing voter intimidation.  Here, as

5   noted above, plaintiff has not alleged any ongoing injury and

6   has failed to demonstrate that its alleged injury cannot be

7   remedied by money damages.

8          In short, plaintiff has failed to demonstrate that it

9   will suffer an actual and imminent injury that cannot be

10  remedied if the Court waits until the end of trial to resolve

11  plaintiff's claim, *Singas Famous Pizza Brands Corp*, 468 F.

12  Appendix at 45.

13         For those reasons, Plaintiff's motion for preliminary

14  injunction is denied.

15         I would be remiss, however, if I did not point out

16  several other issues with this case.  First, this case began on

17  May 31, 2021 with plaintiff filing a motion for an order to

18  show cause on an emergency basis why a preliminary injunction

19  should not be granted.  Because the All Star Game was at that

20  point almost exactly six weeks away, plaintiff put this

21  litigation on a fast track for the opponents and for the Court.

22  But this exigency was entirely of plaintiff's own doing.  Had

23  this lawsuit been filed in April or even in early May, the

24  parties could have responded on a standard schedule.

25         Second, to say that the legal underpinnings of this

L6AGjobC

 1  lawsuit are weak and muddled is an understatement.  Plaintiff
 2  alleges that defendants were members of a conspiracy to violate
 3  JCN's members' constitutional rights to equal protection and to
 4  equal privileges and immunities.  But I am still at a loss to
 5  understand how.  Even assuming small business owners are a
 6  group that is protected by the equal protection clause -- and
 7  plaintiff has cited to no case that so held, and during oral
 8  arguments seemed to shift to argue that the class is all of the
 9  residents of Georgia -- MLB did not in any way, shape or form
10  single that group out -- that group being small business
11  owners -- for adverse treatment.  MLB voted with its feet when
12  the politicians in Georgia made a policy decision with which
13  they strongly disagree.  For all this court knows, many of the
14  small business owners in the Atlanta area agree with the MLB
15  that the policy decisions reflected in the new Georgia election
16  law are poor policy choices.  But whether small business owners
17  as a group agree or disagree, are deeply divided or are
18  agnostic on that issue, it is hard to see how MLB's decision
19  had an impact on the equal protection rights of small business
20  owners as a group.  Indeed, the decision treated large and
21  small, black and white, Latin, Asian, Protestant, Jewish,
22  Muslim, Buddhist and Atheist, male and female, straight, gay
23  and transsexual, democratic and republican business owners
24  exactly the same.
25          Equally muddled is plaintiff's theory regarding

L6AGjobC

1      whether MLB and its union are state actors.  It is true that

2      many baseball teams benefit from massive infusions of public

3      dollars into the construction of stadiums.  And it is true that

4      baseball has an exemption from the antitrust laws and is known

5      as America's pastime.  But those facts individually and in

6      combination just do not convert MLB into a state actor.

7              And of course, during oral argument, plaintiff

8      asserted that MLB's good faith is irrelevant.  The hindrance

9      theory requires that the bad actor have a racial or other

10     class-based invidious animosity.  Disagreeing with legislation

11     does not equal racial or class-based invidious animus.

12             In sum, the motion for preliminary injunction is

13     denied.

14             On the assumption that plaintiff intends to continue

15     this lawsuit, the Court will schedule an initial pretrial

16     conference for early July.  You will get an order setting the

17     date and the required submissions.

18             Anything further from the plaintiff?

19             MR. KLEINHENDLER:  Thank you, your Honor.

20             Are you going to enter the transcript in as an order?

21             THE COURT:  You are welcome to buy it.  I have put it

22     on the record.

23             MR. KLEINHENDLER:  Thank you.

24             THE COURT:  I'm confident the court reporter would be

25     more than happy to sell it to you.  Small business owners, you

L6AGjobC

1    know.

2              Anything further from Major League Baseball,

3    Mr. Hardiman?

4              MR. HARDIMAN:  Nothing, your Honor.  Thank you.

5              THE COURT:  Anything from the union?

6              MR. KESSLER:  Nothing from us, your Honor.  Thank you.

7              THE COURT:  Thank you.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25